## SOUTH TEXAS INV. CO. et al. v. HARRISON.

No. 11600.

Court of Civil Appeals of Texas. San Antonio.

April 24, 1946.

Rehearing Denied May 22, 1946.

Bismark Pope and Horace C. Hall, both of Laredo, for appellants.

Gilmer & Weatherby, of Kerrville, and Morriss & Morriss, of San Antonio, for appellee.

NORVELL, Justice.

This is a suit in equity, brought by Jim Reese as next friend of George E. Harrison, an alleged incompetent, against South Texas Investment Company, a Texas corporation, and a number of other defendants, particularly E. G. Clingenpeel. Other defendants will be mentioned by name when hereinafter necessary. Plaintiff prayed for the cancellation of some twenty-two written instruments and that his title to five tracts of land situated in Real County, Texas, be adjudged free and clear of all claims on the part of the defendants in the suit.

The five tracts involved were: Survey 1526, Section 6, Bexar Land District, containing 42.15 acres; Survey 1527, Section 6, Bexar Land District, containing 250 acres; Survey 67, T. W. N. G. Ry. Co., containing 640 acres; 100 acres of land out of Survey 1528, Edward Hughes, original grantee, and State School Section 66, T. W. N. G. Ry. Co., original grantee, containing 640 acres of land. The total acreage of the five tracts is 1,672.15 acres, more or less.

Judgment below was for the plaintiff. South Texas Investment Company, E. G. Clingenpeel and his wife, Olive C. Clingenpeel, bring the case here.

The primary issue involved relates to the mental capacity of George E. Harrison.

The trial court filed findings of fact and conclusions of law. The following facts are either undisputed or unquestioned:

On January 31, 1935, George E. Harrison executed a deed to the five tracts of land involved, conveying the same to the defendant A. M. Callison.

This conveyance to Callison was apparently executed in order to secure certain funds to be used in paying certain claims against the land held by the Federal Land Bank of Houston, as well as taxes against the property. On February 1, 1935, Harrison and Callison signed a written agreement under the terms of which Callison agreed to reconvey the land to Harrison, provided that Harrison, within two years from February 1, 1935, repaid to Callison all sums of money advanced by him, together with interest thereon at the rate of ten per cent per annum, plus a bonus of $2,000. The contract further provided that Callison was to have possession of the premises during the two-year period and receive all rents and benefits therefrom.

On January 24, 1937, Harrison executed a power of attorney to E. G. Clingenpeel and also conveyed to him a one-half interest in the property.

On January 27, 1937, Clingenpeel paid Callison $3,630, which sum represented the amount of money advanced by Callison under his agreement with Harrison and $508.34 interest. The $2,000 bonus was not paid.

Callison conveyed the property to Harrison and Clingenpeel, share and share alike.

The money paid to Callison was obtained by two loans upon separate tracts of the land here involved, secured by deeds of trust. One deed of trust covered Survey 1526, 25 acres out of Survey 67, and all of Survey 66, and secured the payment of a note for $2,500 payable to the order of W. A. Hall. The second deed of trust covered 100 acres out of Survey 1528 and secured a note for $1,130 payable to H. B. Zachry.

Neither of the notes above mentioned was paid and the deed of trust liens were foreclosed and the property bought in at the trustee's sales by South Texas Investment Company, a Texas corporation controlled and dominated by Clingenpeel.

Thereafter, on September 29, 1938, South Texas Investment Company conveyed to W. N. Holmes fourteen acres of land out of Survey 1527, and Clingenpeel received $250 in cash out of this transaction.

On November 8, 1938, South Texas Investment Company conveyed ten acres out of Survey 1527 to Mary Garrett Johnson. Clingenpeel received $1,000 from this transaction.

On November 18, 1938, South Texas Investment Company conveyed 240.15 acres of land to J. Brooke Hamilton, being all of Survey 1526 (42.15 acres) and 198 acres of Survey 1527. Out of a cash consideration of $10,000 paid, $3,110.84 was paid to the Federal Land Bank of Houston, and the balance of $6,889.16 was received by Clingenpeel.

On May 13, 1939, South Texas Investment Company conveyed ten acres out of Survey 1527 to George A. Flanders. Clingenpeel received $1,000. Flanders later conveyed this 10 acres to J. E. Carr.

As a result of these sales and conveyances by South Texas Investment Company, Clingenpeel, or his alter ego, South Texas Investment Company, received a total of $9,139.16.

Upon the trial, compromise settlements were effected whereby it was agreed that the title to the lands acquired from South Texas Investment Company by the defendants W. N. Holmes, Mary Garrett Johnson, the estate of J. Brooke Hamilton and J. E. Carr (assignee of Geo. A. Flanders) should be confirmed upon payment for the benefit of George E. Harrison of $7,325, in addition to the sums theretofore paid to Clingenpeel.

The material controverted findings of the trial court are as follows:

"Plaintiff, George E. Harrison, was of unsound mind on January 31, 1935, then 65 to 70 years of age, and has been of unsound mind at all times thereafter up to and including the present time, and without guardian of his estate, and did not have mental capacity to execute any of the instruments in question.

"Defendant, E. G. Clingenpeel, knew of the condition of mind of the said George E. Harrison, at the time of the transactions in question with him and such knowledge is likewise chargeable to defendant, South Texas Investment Company.

"At all times from and including February 24, 1937, to and including February 1, 1938, there was a relationship of confidence and trust existing between E. G. Clingenpeel and George E. Harrison, said E. G. Clingenpeel occupying the dominant position.

Defendants made no full and fair explanation of the transactions whereby defendants E. G. Clingenpeel and South Texas Investment Company acquired interest in said land from G. E. Harrison or under any instrument executed by him. Said G. E. Harrison obtained no independent advice from any competent and disinterested source in all the transactions in question. The consideration for each of the deeds and instruments purporting to convey title or interest in the property in question to E. G. Clingenpeel and South Texas Investment Company was grossly inadequate.

"The deeds and instruments conveying and by virtue of and under which E. G. Clingenpeel and South Texas Investment Company purported to receive an interest in and title to the lands in suit were procured by the fraud of E. G. Clingenpeel.

"There was no pleading nor proof of good faith on the part of E. G. Clingenpeel in his dealings and transactions with G. E. Harrison, and the Court finds that he acted in bad faith in said matters."

The trial court also found that the sum of $3,119.59 was due to George E. Harrison from South Texas Investment Company and E. G. Clingenpeel for the use and occupancy of the premises involved.

Based upon the findings of fact, the trial court rendered a decree cancelling the written instruments relating to the transactions hereinabove mentioned. Harrison was awarded title to 100 acres out of Survey 1528, 18 acres out of Survey 1527, all of Survey 66 (subject to a lien held by the Federal Land Bank of Houston), and all of Survey 67, free and clear of all claims of defendants.

The lands described in the judgment are all of the five tracts described in the petition, less the tracts confirmed to W. N. Holmes, Mary Garrett Johnson, J. E. Carr (assignee of George A. Fleming) and the estate of J. Brooke Hamilton, deceased, in accordance with compromise settlements heretofore mentioned, which were by the final decree expressly approved and made effective by the court.

A money judgment for $3,119.57 was also awarded in favor of Harrison and

against South Texas Investment Company and E. G. Clingenpeel, jointly and severally.

We think it apparent from the above statement that this appeal turns upon whether or not the evidence supports the trial court's finding that George E. Harrison did not have the mental capacity to execute the written instruments which were cancelled by the decree.

If in truth and in fact Harrison were lacking in sufficient mental capacity to make a valid agreement, the finding of the trial court that Clingenpeel was aware of this incapacity, is entirely reasonable in the light of the evidence and should not be disturbed by this court. And if these two elements be established, the mental incapacity of Harrison and knowledge thereof by Clingenpeel, the trial court's finding of fraud upon Clingenpeel's part seems inescapable.

Certain of appellants' points are directed against details recited in the findings of the trial court, which might possibly have some pertinence should the finding of Harrison's mental incapacity be set aside. Otherwise they are deemed immaterial.

Stated specifically, the controlling question in this case is whether or not at the times of the execution of the various instruments here involved, Harrison had sufficient mind and memory to understand the nature and effect of his acts in executing such instruments. Smith v. Thornhill, Tex. Com.App., 25 S.W.2d 597, 34 S.W.2d 803.

■ The trial court having found that Harrison was mentally incapacitated, this Court in determining the sufficiency of the evidence to support this finding will consider the evidence in the light most favorable to such finding. 3 Tex.Jur. 1063.

■ It is conceded that Harrison was eccentric or peculiar. Appellants, however, contend that "general unsoundness of mind or incapacity to understand a particular transaction is not established by the simple fact that a person may be eccentric, forgetful or given to delusion." 24 Tex. Jur. 374.

While we are in agreement with the rule of law stated, we are also of the opinion that appellee's evidence went far beyond a showing of mere eccentricity or simple delusion.

The briefs in this case are quite lengthy and deal principally with the evidence relating to Harrison's mental condition. We have read the evidence contained in the statement of facts which bears upon this issue, and in attempting to restrict this opinion to a reasonable length, it is necessary to state the contents of the voluminous statement of facts in the briefest of abstract form.

Harrison was unmarried and apparently had no known relatives. Numerous witnesses who had known Harrison for a number of years were called by the appellee. Their evidence shows that Harrison was suffering from numerous delusions, such as, that he was related to George V, the King of England; that he was the owner of a large estate in the State of Oklahoma; that he was the owner of the land upon which the town of Leakey was situated; that he had built the railroad into Camp Wood; that he owned two large surveys in Real County, although the general understanding in the community was that these surveys were owned by other persons whose titles had never been questioned; that he was the cousin and only heir of a certain Will Harrison who had been waylaid and murdered in Oklahoma, and had left an estate valued at over a million dollars.

Harrison seemingly lived in fear of impending death or grievous bodily injury. He told various witnesses that persons, apparently interested adversely to him in his claims to an Oklahoma estate, were trying to kill him. These persons were described as "Indians" and later as "Japs." He became particularly afraid of an elderly man known as "Deafy" Davis who was employed as a janitor at the Courthouse in Leakey. Harrison told witnesses that he suspected that "Deafy" had been sent to Leakey to kill him. He became suspicious of one of the stenographers at the Courthouse, and told witnesses that this girl was Pearl Hickman, former secretary to the murdered Will Harrison, and that she had gotten control of the estate

and was in Leakey to spy on him, George Harrison, and do him harm.

Witnesses told of instances of seeing Harrison along a road or highway; that Harrison would run from them and disappear in the woods as if he feared they would do him some bodily injury.

One witness related an incident which took place when he attempted to lease some of Harrison's land. Something was said about persons then on Harrison's land who paid no rent. Harrison said these people were Indians and he was allowing them to use the land as he expected to use them as witnesses in a lawsuit in Oklahoma.

According to the testimony, Harrison in appearance was sloven and unkempt. He often appeared clad in two or three shirts and several pairs of pants. He used wire to tie his shoes and did not remove his shoes when he went to bed at night. Apparently, since January 31, 1935, Harrison had made no effort to make a beneficial use of his property, but led a rather precarious existence as a day laborer. "He didn't seem to know the value of a horse or a cow or anything else." He was unreliable and would move around from place to place and disappear for days at a time. One witness stated that Harrison "was liable to come up to your house at any time of the night and (you'd) hear him hollering out there and he wouldn't want nothing."

Another witness stated that Harrison told him that he had been out surveying land belonging to another person in the night time, using a long piece of wire for the purpose. This was evidently done in furtherance of some supposed claim Harrison had upon this tract of land.

At times Harrison was garrulous. As one witness expressed it, he would "wart a person until you had to walk off and leave him talking to himself about his estates, claims and things."

A number of letters written by Harrison are in the record. These letters evidence an incoherence of thought and seemingly have reference to lands and fortunes which Harrison believed were his.

Dr. W. J. Johnson testified for appellee as an expert upon mental diseases. As to Harrison's condition, the doctor testified that: "He had all evidence or symptoms of arteriosclerosis of the brain. * * * The brain is supplied or fed by the circulation of the blood through the arteries in the brain. When the arteries get hard they become more impervious and consequently the brain can not be fed as well and it is more a starvation of the brain, and it causes what we call 'senile dementia.' That condition existing in the brain causes an impoverished condition there with deterioration of the functions of the higher centers of the brain which (results) in impaired memory and defective judgment and reasoning."

Dr. Johnson testified definitely that Harrison was of unsound mind and suffering from the type of insanity known as senile dementia. As to the effects of this mental disease, the expert testified that "the memory is impaired more for recent events than for remote events and then necessarily because of an impaired memory the judgment and the reasoning of a man is impaired because they are founded largely on memory. Those functions of the brain are founded on memory. The memory becomes impaired. The reasoning and judgment becomes impaired and then delusions frequently follow. That is, they imagine things that are not true and they are guided frequently by those false beliefs and they will form their ideas and conclusions on those false beliefs. They cannot see themselves as others see them or don't have any insight into their own condition. * * *

"Delusions are real to these individuals —very real because they believe that just as much as they believe anything else. Just the same as a normal man believes the real things of life but these are imaginary beliefs but to them they are very real and true. * * *

"They are easily influenced even though they may seem more stubborn because of their lack of memory—failure of memory and the failure of their judgment and reasoning. They cannot draw the proper de-

ductions and conclusions and they are more easily influenced because of that."

Dr. Johnson further testified that in his opinion Harrison's mental deterioration had commenced about fifteen years prior to the time of his examination of Harrison in 1944.

As to lucid intervals, the doctor stated: "They (persons suffering from senile dementia) never do have (lucid intervals). It's impossible to have. It's the same as a paralysis, beginning and increasing to where you are totally paralyzed. At first it begins in a small manner and increases, but it never is well. It progresses all the time. * * * That condition is universally true of senile dementia."

The opinions of Dr. Johnson support the conclusion that since January of 1935, Harrison has lacked the mental capacity to understand the nature and effect of his acts in executing the contracts and agreements here involved.

■ Appellants' contention or position with reference to all this mass of detailed testimony seems to be that it does not specifically bear upon a particular transaction or relate to the time of a particular transaction. It is true that Dr. Johnson was not present when Harrison signed any particular written instrument questioned in this litigation. The same may be said of appellee's lay witnesses. However, the lay witnesses' testimony as well as the testimony relating to Dr. Johnson's conversations with Harrison do show that Harrison was suffering from numerous mental delusions. In turn, the medical testimony is to the effect that this unsound mental condition is due to a mental disease—a definite impairment of the brain centers—and that one so suffering from said disease to the extent that Harrison was, is incapable of understanding the nature and effect of his contractual acts. We, therefore, conclude that the trial court's finding that Harrison was mentally incapacitated has support in the evidence.

■ Appellants make a further contention, based upon the case of Kimmel v. Tipton, Tex.Civ.App., 142 S.W.2d 421. In April of 1942, the deposition of Harrison was taken in this case. Appellants say that in said deposition Harrison testified to facts and circumstances which conclusively demonstrate that Harrison understood the nature and effect of his acts in executing the various instruments here involved. As above pointed out, the trial court found that during the time in which this deposition was taken, Harrison was of unsound mind. We have read this deposition and are not convinced that Harrison's answers to the questions submitted to him demonstrate that he was a rational person at the time. Nor do we believe it can be said from Harrison's testimony contained in the deposition that he made unequivocal statements of fact, which if taken as true would confute the theory of his suit.

■ In Kimmel v. Tipton, the sanity of Mrs. Carrie Ellen Tipton at the time she testified was unquestioned. Consequently, it was held that she was conclusively bound by her own testimony and could not recover after testifying positively to the existence of facts which if true would defeat her right of recovery. This rule obviously has no application to persons who are of unsound mind at the time they are called as witnesses or their deposition is taken. The trial court found that Harrison was of unsound mind during the period of time in which his deposition was taken and that finding has support in the evidence.

■ We find no error in the trial court's action in adjusting the equities as between Harrison and Clingenpeel or in awarding a money judgment in favor of Harrison and against Clingenpeel and South Texas Investment Company based upon the rental value of the premises involved.

It is true that Clingenpeel, out of the proceeds of the Hall and Zachry loans, did pay off the indebtedness held by Callison. Callison had paid off part of the indebtedness owed by Harrison to the Federal Land Bank of Houston and also paid certain taxes assessed against the property. It is conceded that the land bank indebtedness and the taxes were secured by valid liens against Harrison's property.

However, the trial court found that "the amounts paid out by E. G. Clingenpeel for the benefit of George E. Harrison and his estate were more than offset by the proceeds of the four sales above mentioned, to Holmes, Johnson, Flanders and Hamilton, * * *." This finding has support in the evidence.

In our opinion none of appellants' points discloses a reversible error. All of appellants' points are overruled and the judgment of the trial court is affirmed.