UNITED STATES of America, Appellee,

v.

Mark Douglas ODOM, Appellant.

UNITED STATES of America, Appellee,

v.

Joyce Geraldine BEACH, Appellant.

UNITED STATES of America, Appellee,

v.

Benny Carol DYSON, Appellant.

Nos. 83–5218(L), 83–5219 and 83–5220.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 10, 1984.
Decided May 22, 1984.

William C. Gray, Wilkesboro, N.C., for appellant Dyson.

Larry S. Moore, North Wilkesboro, N.C., for appellant Beach.

John E. Hall, Wilkesboro, for appellant Odom.

Max O. Cogburn, Jr., Asst. U.S. Atty., Asheville, N.C. (Charles R. Brewer, U.S. Atty., Kenneth D. Bell, Asst. U.S. Atty., Asheville, N.C., on brief), for appellee.

Before WINTER, Chief Judge, RUSSELL and MURNAGHAN, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

The defendants appeal their convictions arising out of absentee voting in a federal and state election conducted in Alexander County, North Carolina in November 1982. In the first twenty-eight counts of the mail fraud indictment the defendants Odom, Beach, Dyson and Lackey were charged with participation in a scheme to cast false and fraudulent absentee ballots and in counts twenty-nine and thirty, the defendants were charged with conspiracy to vote more than once and with the substantive offense of so voting in the election.[1] The defendants were convicted on all counts and received concurrent sentences. Three of the defendants (Odom, Beach and Dyson) have appealed their convictions on a number of grounds.[2] The defendant Lackey chose not to appeal. We find no basis for reversal in any of the grounds and accordingly affirm the judgments of convictions.

I

In the general election held on November 2, 1982, the sheriff and clerk of court of Alexander County were candidates for reelection. In that same election there were federal candidates for the United States House of Representatives. The defendant Odom was a deputy sheriff under the incumbent Alexander County sheriff who was a candidate for reelection; the defendant Lackey was also employed part time by the County sheriff; the defendant Beach was an employee in the office of the County Clerk of Court, who was similarly a candidate for reelection; and the defendant Dyson was a friend of Odom.

The alleged scheme involved casting absentee votes in the name of residents of The Belle's View Rest Home in Alexander County. The residents were generally persons of advanced years, feeble both physically and mentally. The defendant Odom testified to his visits to the Home and his discussions with the Home's manager relative to voting absentee the residents of the Home for the "straight Democratic" ticket, which would include both the incumbent sheriff and clerk of court. As a result of these discussions, Odom, accompanied by the defendant Dyson, brought to the Home letters which had been prepared requesting authorization to vote absentee in the approaching election to be mailed under the plan to vote in the name of the residents of the Home.[3] These letters were signed with

---

1. 18 U.S.C. § 2, 1341; 42 U.S.C. § 1973i(e) and 18 U.S.C. 371.

2. References to the defendants hereafter are limited to the three appealing defendants, unless otherwise indicated.

3. Defendant Odom testified that he also delivered such letters to Miller-Graham, which is a related institution to The Belle's View Rest Home located in another part of Taylorsville. There is no testimony that Odom, however, ever returned to Miller-Graham in connection with these letters.

the names of the Home's residents, as furnished by the manager of the Home.[4] Presumably, such letters were not signed personally by most of these residents, since the record establishes that only a few of the residents could write their names. A Rest Home employee, Steve Connor, testified that he helped fill out the applications and that those residents capable of signing their own names did so, while he signed for those unable to sign. According to the testimony offered by the Government, these letters requesting authorization to vote absentee were mailed by Odom to the County Board of Elections for processing. On October 28 when they ascertained that the applications had been approved by the Election Board and the ballots mailed back to the residents, together with an envelope in which the ballot of each voter was to be placed, Odom and Dyson returned to the Rest Home for the purpose of voting the ballots sent to the residents of the Home. The defendants Beach and Lackey and Ms. Donna Wike, a North Carolina notary public and legal secretary, who was indicted but has entered into a plea bargain with the Government, arrived shortly afterwards by previous arrangement. Ms. Wike's function at the Home was to notarize the affidavit forms for each voter on the envelope in which the voter's ballot was to be inserted for mailing to the County Board of Elections. This affidavit form consisted of a statement in which the voter swore that he or she was a voter in the precinct where he or she was voting and was unable to travel to vote in person. It concluded with a declaration under oath by the voter that he or she had "made application for absentee ballots and [that he or she had] marked the ballots enclosed herein, or they were marked [for him or her] in [his or her] presence and according to [his or her] instructions." This form was required to be signed by the voter, or by his or her authority, and to be duly notarized. Without such affidavit, duly signed and notarized, the ballot could not be received or counted.

Odom, Beach, Dyson, Lackey and Wike had a room in the Rest Home made available to them for handling the voting. Eight residents of the Home who could sign their names were brought into the room where the five participants in the scheme were. These eight signed the affidavit forms on the ballot envelopes and their signatures were notarized by Ms. Wike. After signing their names, the eight left. They were not asked and did not signify how they wanted to vote, according to the Government's witnesses. No other residents of the Home came into the room. According to Ms. Wike, two employees of the Rest Home were then brought in because Odom and his associates indicated that they wanted "someone else [than the defendants] to sign the [affidavit form on the] envelopes" for the other residents. So far as Ms. Wike observed, these employees, along with one or more of the group in the room, signed all the affidavits on the ballot envelopes in which the ballots of the remaining residents were to be sealed, so that it was their signatures and not those of the residents which she notarized.

After the names of these residents who could not write on the form printed on the envelopes had been signed by one of the persons present in the room, Ms. Wike, under the direction of the defendants, notarized the signatures as those of the various residents. According to the testimony of an employee of the Home, some of those whose names were thus signed were not even at the Belle's View Rest Home but were at Miller-Graham Home, a related Rest Home located on the other side of Taylorsville, and two of the residents of Belle's View whose names were signed were away at school on October 28. During the time the ballot envelopes were being signed and notarized, Ms. Wike testified that she, Odom, Beach, Dyson, Lackey, and several Home employees who were signing the forms, were the only ones present in the room.

**4.** The manager of the Rest Home had had a stroke and was confined in intensive care at the local hospital, unable to speak. She accordingly did not testify at trial.

After the forms on the envelopes had been filled in, signed and notarized, Ms. Wike said that Odom began marking some ballots, and took other ballots and laid them out, instructing the other people to join in the task of "mark[ing] them straight Democrat." While the ballots were being marked Ms. Wike testified that she heard Odom instructing those marking the ballots to write in the name of Glenn Hofecker. After the ballots had been marked and placed in the ballot envelopes they were mailed by Odom to the County Election Board, and were later counted in the election.

Both before and after the election, the Federal Bureau of Investigation received complaints of fraudulent absentee voting in Alexander County. These complaints were followed by a federal grand jury investigation, with the result that the defendants were indicted, prosecuted, and convicted. The defendants have appealed, citing what they claim were a number of reversible errors at trial. We accordingly address these claims of error.

II

The defendants, as their first ground of appeal, complain that they were denied the right during cross-examination to ask Ms. Wike what "she understood would be the benefits of her plea bargain" and particularly what her "beliefs were regarding sentencing as a result of her conversations with her attorney." A review of the record shows that Ms. Wike was cross-examined about any promises made her in relation to her sentence as a result of her plea bargain. She testified categorically that the Government made no promises with respect to her sentence other than that she would be "sentenced under the Youth Adult Offenders Program" and that "whatever sentence that [she] got will not be on [her] permanent record after [she] had served that time since [she] was under 22." She specifically testified during cross-examination that the Government, in the discussions generating the plea bargain, "didn't use [sic] what sentence I

would get." She further denied in her cross-examination that the United States Attorney's office had informed her that in "their opinion" she would, because of her cooperation, "receive a probationary type sentence, but [that] they couldn't guarantee it but that was their opinion." She added, when queried directly in cross-examination, whether her own lawyer had not advised her to that effect, that "[h]e (referring to her lawyer) didn't know what I would get either." The defendants then continued with this question:

"I know he [referring to the witness' lawyer] doesn't know what you would get but did he tell you that would be his opinion based on his conversation [presumably with the United States Attorney's office]?"

The United States Attorney objected to the question. The district court sustained the objection.

It is obvious from this summarization of the relevant record that in cross-examination the defendants were not denied the right to probe the witness' understanding and belief with reference to her plea bargain. She testified clearly during the cross-examination that her lawyer had not told her that she would likely, because of her cooperation, "receive a probationary type sentence." It was only after this exchange that, in effect, counsel for the defendants repeated the question and there was objection. Since the witness had already answered the question, there was no error in refusing to allow counsel for the defendants to repeat the question.

This is unquestionably a case different from *Hoover v. Maryland*, 714 F.2d 301, 306 (4th Cir.1983), on which the defendants rely and in which the trial judge indicated his belief that "the letter granting immunity was the only evidence on the contents of the immunity agreement needed by the jury" and denied the defendant any right whatsoever to cross-examine about any unstated benefits or promises given the defendant. The defendants in this case obtained from the witness a clear and complete statement of her understanding of

the plea bargain and of what benefits she would receive as a result. She testified unequivocally as to what her attorney told her. We thus find no error in the district court's ruling, even though it may not have been properly rested on the ground of hearsay.

### III

The defendant Dyson complains that the Government erred in denying his motion for acquittal under the mail fraud counts since "no evidence was produced at trial which suggested that Mr. Dyson knew or had reason to know that the mails would be used to further the alleged scheme." As the Court said in *United States v. Plotke*, 725 F.2d 1303, 1306 (11th Cir.1984), "[a] conviction for mail fraud requires proof of three elements: 1) defendant knowingly participated in a scheme to defraud; 2) the mails were used to implement the scheme; and 3) the use of the mails was caused by someone connected with the scheme." It is plainly not necessary, as this case states, that the one charged be the one who physically did the mailing; it is sufficient that the mailing was by "someone connected with the scheme." *See also, United States v. Ray*, 688 F.2d 250, 253 (4th Cir.1982), *cert. denied*, 459 U.S. 1177, 103 S.Ct. 829, 74 L.Ed.2d 1024 (1983); *United States v. O'Malley*, 707 F.2d 1240, 1248 n. 5 (11th Cir.1983).

There is no denying that Odom, who participated with Dyson in the fraudulent voting scheme actually mailed the ballots. Dyson, however, was directly involved with Odom and the others in the fraudulent scheme. He seems to have been present with Odom on all the key trips to the Rest Home incident to the scheme to vote illegally and fraudulently the residents of the Home. He was present when the ballot envelopes were fraudulently signed and when the ballots were fraudulently marked. The fact that Odom and not Dyson made the mailings is unimportant; the mailings were by one with whom Dyson was connected in carrying out the fraudulent scheme. That is enough to satisfy the requirements of the statute as stated in *Plotke, supra*, 725 F.2d at 1306. *See also, United States v. O'Malley, supra*, 707 F.2d at 1248 n. 5.

### IV

The defendants complain next that the district court "erred in permitting unsworn and otherwise incompetent witnesses to testify for the prosecution." By this claim they challenge the mental competency of the residents of the Rest Home, either to appear or to testify at trial. In connection with that issue, the defendants fault the manner in which the district judge chose to resolve the issue of the competency of such witnesses. It was their position on the procedural question that the district judge should have ruled on the witnesses' competency in an *in camera* hearing. They made a motion for such a hearing, but only at trial during the Government's case in chief.[5] It was denied. The defendants question this denial. On the substantive issue of the witnesses' competency, they assert that the district judge should not have permitted these residents of the Rest Home to testify at all or to appear before the jury but should have found them incompetent.

We address, first, the contention that the district court erred in not granting an *in camera* hearing on the competency of the residents of the Home to appear as witnesses. The defendants' motion for such hearing was not made until near the conclusion of the Government's case-in-

---

5. The motion and the ruling of the district judge appear thus in the record:

"May it please the Court, may we put the motion in the record before we bring the jury in? Your Honor, we would move that, prior to any of these people that Mr. Cogburn has told us about in Chambers being allowed to testify before the jury in this matter, that we be allowed to voir dire them outside the presence of the jury to determine whether or not they are competent witnesses.

"COURT: I think you can do it in the presence of the jury as well as outside the presence of the jury, Mr. Gray. We'll just have to take them one at a time."

chief. They would excuse their delay in submitting such motion with the claim that they had not anticipated that the Government would present these residents of the Home as witnesses. We find this excuse difficult to accept. The heart of the Government's case was whether these residents had knowingly or intelligently voted absentee in the election. On this issue, it would seem inconceivable that the Government would not have subpoenaed the residents at trial. Leaving to the side this matter of delay in submitting the motion, though, the conclusion is inescapable that to grant the motion when made would have required the district judge to interrupt the trial and to excuse the jury while he examined separately *in camera* approximately thirty witnesses, and, to the extent that he found them competent under federal practice, to recall the jury and to go over again much of the testimony that would have been taken *in camera*. Such an interruption in the trial and interference with the orderly process of the case was certainly not required or even prudent.

Rule 104(c), Fed.R.Evid., prescribes the procedure to be followed in connection with motions for *in camera* or out-of-the-presence-of-the-jury hearings, such as the one sought by the defendants. That Rule specifies only one motion on which a defendant is entitled to of right an *in camera* hearing and that is a motion challenging the validity of a confession. In all situations other than an assault on the voluntariness of a confession, the granting of the motion is a matter committed to the discretion of the trial judge. While the Rule itself is silent as to any preference with respect to whether an *in camera* hearing should be granted in this discretionary area, the Advisory Committee's Notes on the Rule leave little doubt as to what its opinion was on the question. It said critically that an *in camera* hearing is "time consuming" and "[n]ot infrequently the same evidence which is relevant to the issue of establishment of fulfillment of a condition precedent to admissibility is also relevant to weight or credibility." It suggested that "time is saved by taking foundation proof in the presence of the jury" and opined that "[m]uch evidence on preliminary questions, though not relevant to jury issues, may be heard by the jury with no adverse effect." It concluded that "[a] great deal must be left to the discretion of the judge who will act as the interests of justice require."

The considerations which the Advisory Committee found militated against an *in camera* hearing are present in this case. The motion, if granted, would have been "time consuming," would have interrupted the trial and its orderly proceedings, and would have required the taking of testimony *in camera* which would have been largely repeated in later testimony before the jury.

Beyond these considerations found by the Advisory Committee to militate against an *in camera* hearing there is the additional consideration arising out of the provisions of Rule 601, Fed.R.Evid. Most writers are of the opinion that "[t]he trial court's responsibility under Rule 104(a) to determine preliminary questions concerning the qualification of witnesses is largely vitiated by Rule 601 which makes all witnesses competent except where state law applied the rule of decision and declares a witness incompetent." 1 Weinstein's *Evidence*, § 104[03], pp. 104–26. With particular reference to any necessity for a preliminary or *in camera* hearing on the issue of witness competency, 3 Weinstein's *Evidence*, § 601[04], pp. 601–28 states:

"Since Rule 601 abolishes all grounds for disqualifying a witness [except when state law furnishes the rule of decision], a preliminary hearing pursuant to Rule 104(a) for the purpose of determining competency is usually no longer required. This does not mean that the trial judge no longer has any power to keep a witness from testifying. It merely means that the judge must shift his attention from the proposed witness to the proffered testimony; instead of ruling on the basis of competency he must recast the problem in terms of relevancy."

Moreover, the authorities decided before the adoption of the Federal Rules of Evidence, generally have recognized that there is no requirement for an *in camera* preliminary hearing on the competency of witnesses. Representative of such cases, decided a few months before the effective date of the Rules of Evidence, is *United States v. Gerry*, 515 F.2d 130, 137 (2d Cir.), *cert. denied*, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975), in which the Court said:

"The competency of a witness to testify before a jury is a threshold question of law which lies exclusively in the trial court's discretion. *United States v. Benn*, 155 U.S.App.D.C. 180, 476 F.2d 1127, 1130 (1972). When competency is questioned there is no legal requirement that the trial judge conduct a formal hearing. There must be such an inquiry as will satisfy the Court that the witness is competent to testify but the form of that inquiry rests in the discretion of the trial court."

Earlier in *Henderson v. United States*, 218 F.2d 14, 17–18 (6th Cir.1955), the Court had said:

"The question of the competency of a witness is for the Court, not the jury. If the competency of a witness is challenged before testifying, it is the duty of the Court to make such examination as will satisfy it of the competency or incompetency of the witness. The form of the examination rests in the discretion of the Court. It is the better practice for the trial judge to either question the witness himself or to be present when the examination is conducted by counsel, and to rule on the basis of the evidence so heard. However, when a mature person of normal appearance and demeanor is offered as a witness, he is presumed to be a competent witness and incompetency must be shown by the party objecting to him."

To the same effect is *United States v. Raineri*, 91 F.R.D. 159, 163 (W.D.Wis. 1980), decided after the effective date of the Rules:

"The necessity of holding such a hearing on the preliminary question of a witness' competency is a matter within the discretion of the trial court. (*U.S. v. Peele*, 574 F.2d 489, 491 (9th Cir.1978); *U.S. v. Gerry*, 515 F.2d 130, 137 (2d Cir.1975)). In my view, the appropriate time for such a hearing is at trial when the testimony of the challenged witness is to be offered, for the relevant question is whether the witness is presently competent to testify."

And, in *United States v. Lightly*, 677 F.2d 1027, 1028 (4th Cir.1982), we approved the action of the district judge in not conducting an *in camera* hearing on the competency of a witness ("The district judge chose not to conduct an *in camera* examination of [the challenged witness] McDuffie.")

■ It is plain from these authorities as well as from the relevant Rules that a district judge has great latitude in the procedure he may follow in determining the competency of a witness to testify. Neither the authorities nor the Rules require an *in camera* hearing. In fact, as we have observed, the suggestion of the Advisory Committee in its Comments on Rule 104 (which covers preliminary motions) is against the delays inherent in a preliminary hearing. The district judge may, according to *Henderson* and *Gerry*, fashion such procedure as he determines on, in his discretion. Weinstein indicates, as we have seen, that the district judge should wait until trial and, on the basis of the witness' demeanor and testimony at the time, his ability to recall, his knowledge of the facts, and his ability to narrate, then resolve the issue as one of credibility more than one of competency. *Henderson* seems to say that the determination may be made on the basis of an informal examination of the challenged witness by the trial judge alone. In any event, there was not an abuse of the district court's discretion in disposing of the motion at trial rather than at an *in camera* hearing.

■ We turn now to the substantive objection to the competency of the Rest Home residents as witnesses. Other than

for the motion for an *in camera* hearing, the defendants made no objection to these residents when they were called as witnesses. Neither did they move to strike the testimony of such witnesses when the latter had concluded their testimony. The general rule is that any objection to the competency of a witness should be raised at the time the party is presented as a witness and, absent objection at that time, any claim of incompetency of the witness is waived; and this is particularly so, if there is no motion to strike at the conclusion of the witness' testimony; *Benson v. United States,* 146 U.S. 325, 332–33, 13 S.Ct. 60, 62, 36 L.Ed. 991 (1892); *Commonwealth v. Smith,* 278 Pa.Super. 21, 419 A.2d 1335, 1336 (1980); *Bowman v. State,* 598 S.W.2d 809, 811–12 (Tenn.Cr.App.1980); *Rhymes v. State,* 356 So.2d 1165, 1169 (Miss.1978); *Cramer v. Tyars,* 23 Cal.3d 131, 151 Cal. Rptr. 653, 658, 588 P.2d 793, 798 (1979).[6] It is true that the defendants did move to strike the testimony of some of these residents on the day following their testimony. Such motion, however, was precipitated by the comments of the district judge at that time and was apparently addressed only to the testimony of those witnesses who had not been sworn. We address this motion later in connection with the objection to the failure to swear the witnesses found incompetent by the district judge. In any event, this motion was clearly directed solely at the testimony of the residents who had not been sworn and had no relevancy to the testimony of those residents who had been sworn. As to these witnesses, the defendants had waived any right to object on grounds of competency by failure to act when required to act by objecting properly.

▰▰▰ It is unnecessary, however, for us to rest our decision on the competency of the residents who were sworn on principles of waiver, since federal procedure as well as common law supports their qualifications. Rule 601, Fed.R.Evid., which is the controlling guide in federal criminal courts on qualifications of witnesses, represents, in the words of the leading commentator on the Rules, "the culmination of the modern trend which has converted questions of competency into questions of credibility while 'steadily moving towards a realization that judicial determination of the question of whether a witness should be heard at all should be abrogated in favor of hearing the testimony for what it is worth.'" 3 Weinstein's *Evidence,* Witnesses, § 601[05], p. 601–37, citing Comment, "Witnesses under Article VI of the Proposed Federal Rules of Evidence," 15 Wayne L.Rev. 1236, 1250 (1969). *See also, McCormick on Evidence,* § 62, pp. 140–41 (Cleary ed. 1972). As a consequence of this purpose of the Rule, Weinstein suggests that it is "probably more accurate to say that [in determining questions under Rule 601], the Court will decide not competency but minimum credibility." *See* 3 Weinstein § 601[01], p. 601–10. Under this rule every witness is presumed to be competent. Neither feeble-mindedness not insanity renders a witness incompetent or disqualified. The defendants so concede and we specifically so held recently in *United States v. Lightly, supra,* 677 F.2d at 1028. The only grounds for disqualifying a party as a witness under Rule 601, according to *Lightly,* are that the witness "does not have knowledge of the matters about which he is to testify, that he does not have the capacity to recall, or that he does not understand the duty to testify truthfully." *Id.* at 1028. Most of the state decisions are to the same effect. *See for instance, Commonwealth v. Pronkoskie,* 477 Pa. 132, 383 A.2d 858, 860–61 (1978); *People v. Coca,* 39 Colo. App. 264, 564 P.2d 431, 433 (1977). Whether the witness has such competency is a matter for determination by the trial judge after such examination as he deems appropriate and his exercise of discretion in this regard is to be reversed only for clear

---

**6.** There is no evidence in this record that the witnesses whose testimony was in question had "mentally deteriorated" between the date of the election and the trial. There was testimony of the acting manager of the Rest Home that the mental condition of the witnesses was comparable at both times. The defendants did not question this testimony and it stands unrefuted in the record.

error. *United States v. Martino*, 648 F.2d 367, 389 (5th Cir.1981), *cert. denied*, 456 U.S. 943, 102 S.Ct. 2006, 72 L.Ed.2d 465. Judged by this standard we find no error in the ruling of the district judge on the competency of the witnesses who were sworn.

The defendants do not seem, however, to center their argument in this connection on incompetency of the residents as witnesses *per se*, or on the irrelevance of their testimony; their objection is rather one to the very right of the residents to appear at trial. Their contention is basically that the "mentally debilitated" condition of these residents, "evident both in their appearance and testimony," is such as to create inescapably in the minds of the jury "[t]he manifest implication" that "the [defendants] *must* have been guilty of vote fraud because the patients were incapable of formulating a voluntary or informed choice"[7] when their ballots were voted in the November election. Under those circumstances, the defendants argue that they were prejudiced by the appearance at trial of the residents, and for that reason the district court should not have permitted such parties to be presented as witnesses at trial. The flaw in this argument is that it fails to state a ground for disqualification under Rule 601 and, more than that it is contrary to a rule applied from time immemorial in determining insanity or incompetence. From the earliest days, the rule at common law has been that when mental competency or capacity is in issue, it is approved practice that the chancellor or the jury (dependent on which is to resolve the issue) should observe the person whose competency is in issue, to note his demeanor and his responses to questions, in reaching a decision. This rule was stated with precision in *Mettetal v. Hall*, 288 Mich. 200, 284 N.W. 698, 700 (1939):

"It seems to have been the established rule of the common law that it was proper that the person alleged to be mentally incompetent should appear before the chancellor for inspection. Abbot of Strata Marcella's Case, 9 Coke's Rep. 31 a; 3 Blackstone's Commentaries, p. 332. In case mental incompetency became involved in such a way that the mental condition of a person was to be determined by the jury, inspection by the jury was an allowable mode of acquiring knowledge on an issue of insanity. 1 Hale's Pleas of the Crown, pp. 29, 33. See, also, 2 Wigmore on Evidence, § 1160."

Wigmore is to the same effect (2 Wigmore on *Evidence*, § 1160, p. 360):

"On an issue of *idiocy* or *insanity*, it was from an early period regarded proper that the person should appear before the Chancellor for inspection. Since the Chancellor is upon the subject of insanity no less a layman than is a juryman, it seems equally proper, and has been perhaps equally long established, that inspection by the jury should be an allowable mode of acquiring knowledge on an issue of insanity." (Emphasis in text)

The most important factual issue in this case was the competency of these residents to exercise what the defendants characterize as "a voluntary or informed choice." For the jury to resolve this issue, it was not merely relevant, it was actually compelling that the jury be permitted to see the residents and to hear their responses, and to judge for themselves first-hand the conduct and comprehensiveness of the persons whose competency was the dispositive issue. If the very appearance, demeanor and conduct of these witnesses marked them as being "incapable of formulating a voluntary and informed choice," as the defendants suggest, that appearance and demeanor were properly relevant for the consideration of the jury. If the defendants were prejudiced in their defense by these "manifest" demonstrations of inability on the part of the residents to make such a choice and to give such an authorization, it is a prejudice for which the defendants must accept the responsibility. It follows that however the question may be considered—whether under Rule 601 or at common

---

**7.** Emphasis in brief.

law—the district judge did not commit clear error or abuse his discretion in permitting the residents to be presented as witnesses and in allowing those he ordered sworn to testify.

There were, however, nine witnesses called, whom the district judge refused to allow the clerk to swear. There was no objection to the competency of these witnesses when they were presented. The Government was permitted to examine these parties and the defendants were given the opportunity to cross-examine them. In some instances, the defendants exercised the right to cross-examine the parties in question. Of the residents of the Home who did not testify, five did not even respond to their names or show any ability to comprehend the questions directed to them or to give any testimony whatsoever. Because of this obvious incapacity, the Government made no effort to continue the examination of these witnesses and the defendants forewent the opportunity to cross-examine them. The other four gave such contradictory answers in direct and cross-examination that the district judge concluded that such persons were not competent and should not be sworn. At no time during the presentation or examination of these witnesses and the failure of the clerk to administer the oath to them did the defendants offer any objection. It was not until the day after these witnesses had been called that any question was raised about the propriety of the parties' being presented as witnesses or to their testify-ing to such extent as it could be said they had testified. And the objection made at this late time was only in response to an inquiry made of counsel by the district judge. The circumstances under which the district judge raised the point deserve to be examined.

The morning after the residents of the Rest Home had been presented as witnesses and nine of them had not been sworn, the district judge, out of the presence of the jury, brought up the fact that some of the persons called had not been sworn by the clerk pursuant to his instruction.[8] The defendants then moved to strike the testimony of the witnesses. In making the motion, the defendants stated no grounds. The district judge responded that he would recall the witnesses who had not been sworn and permit re-cross-examination. The defendants, after a conference, advised the court that they would withdraw their objections to the appearance and testimony (such as it was) of the witnesses and would not request the recalling of the witnesses. On this appeal, however, the defendants now complain of the absence of an oath by these nine persons. We find the complaint without merit.

■ It is well settled that the swearing of a witness is waived by failure to raise the point during the witness' testimony, thus denying the trial court an opportunity to correct what has been characterized as an "irregularity."[9] The rationale of this principle was declared a century and a half

---

8. The Court's statement was as follows:
   "Before we start this morning, yesterday afternoon we had these people from the nursing home here, as you know. I directed the Clerk, in my discretion, not to bother to try to swear some of them, because obviously they couldn't even talk when you got them up here. They didn't know the answers, didn't know their names, how old they were or anything else. Of course, the Court is conversant with the fact that witnesses ought to be sworn. I want to know now on the record if any of you gentlemen have any questions, that is, the defense counsel, with the Court's procedure in that way. If you do, I want to know it now."

9. In the Note, *A Reconsideration of the Sworn Testimony Requirement: Securing Truth in the Twentieth Century*, 75 *Mich.L.Rev.* 1681 (1977), the author concludes after an exhaustive discussion of the background and rationale of the oath requirement, at p. 1707:
   "Yet the oath is largely an historical artifact: to borrow Justice Holmes' oft-quoted phrase, to a significant extent 'the grounds upon which [the traditional rule] was laid down have vanished long since, and the rule simply persists from blind imitation of the past.' * This being the case, the deep and uncritical confidence placed in the sworn nature of testimony cannot longer be justified." [* O.W. Holmes, Collected Legal Papers 187 (1920) (footnote in original) ].
   *See, also, United States v. Looper*, 419 F.2d 1405, 1406–07 (4th Cir.1969).

ago in the oft-cited case of *Cady v. Norton,* 14 Pick. 236, 237 (Mass.1833). The Court in that case stated two justifications for the rule: First, the defect or failure could have been corrected if a timely objection had been made; second, in the absence of a waiver rule counsel might deliberately avoid objecting to a witness being unsworn in order to have a ground of appeal.

The leading federal case applying this waiver principle as stated in *Cady* is *Wilcoxon v. United States,* 231 F.2d 384, 386–87 (10th Cir.), *cert. denied,* 351 U.S. 943, 76 S.Ct. 834, 100 L.Ed. 1469 (1956). In that case, two witnesses who spoke only Spanish were not sworn in Spanish. The contention on appeal was that the failure to administer the oath in Spanish to the witnesses was "tantamount in law to the witnesses giving testimony without the oath being administered to them in any form." For purposes of the decision, the Court accepted this contention. This failure to swear the witnesses was not raised until motion for a new trial. In support of the motion, counsel for the defendant filed affidavits of both the defendant and his two attorneys. In those affidavits, the affiants declared "that at no time during the trial were the affiants aware of the fact that the oath was not interpreted to the two witnesses in Spanish." The Court denied the motion, stating that "it was the duty of appellant and his attorneys to take notice of the several steps in the proceeding.... And that duty included notice of the manner in which the oath was administered to the witnesses." Accordingly, it was held that the appellants could not stand quiescent while the witnesses testified and later assert error, that under those circumstances the failure to swear the witnesses had been waived.[10]

This case has been followed consistently in subsequent federal cases. Thus, in *United States v. Perez,* 651 F.2d 268, 273 (5th Cir.1981), the Court said:

"It has long been the general rule that even a failure to swear a witness may be waived. This may occur either by knowing silence and an attempt to raise objection after verdict or by the mere failure of counsel to notice the omission before completion of the trial."

*See also, Beausoliel v. United States,* 107 F.2d 292, 294 (D.C.Cir.1939) (" 'we are of the opinion that the irregular administration of the oath to a witness, or the taking of testimony without an oath at all, must, if known to the adverse party, be objected to at the time. He may not, with knowledge of the irregularity, permit the trial to proceed, and raise the question after verdict.' This is the uniform rule." *To the same effect see: O'Neill v. Clark,* 57 Neb. [760] 769, 78 N.W. 256, 257–58 (1899); *Sewall v. Spinney Creek Oyster Co., Inc.,* (Me.) 421 A.2d 36, 39 (1980); *Saxton v. State,* (Ala. Cr.App.1980) 389 So.2d 541, 543 (In this criminal appeal, a state's witness, was, apparently inadvertently, not sworn. The defendant's counsel let him conclude his testimony, then asked for a mistrial. The court denied the motion, and instead swore the witness, who testified to substantially the same things he had already said. It was held that the trial judge committed no error: "If a witness is allowed to give evidence before the jury without first being lawfully sworn, it is the duty of the judge, as soon as it is called to his attention, to immediately administer a proper oath"); *In re Brown v. Ristich,* 36 N.Y.2d 183, 366 N.Y.S.2d 116, 123, 325 N.E.2d 533, 538 (1975); *In re Simmons Children,* 154 W.Va. 491, 177 S.E.2d 19, 23–24 (1970);

**10.** Judge Murrah dissented in this case. In so doing, however, he conceded that "the right or privilege, [to have the witnesses sworn] like any other right, may be intelligently waived, but I do not believe that it was deliberately and intelligently waived in this case." The reason for this caveat by Judge Murrah was that these two witnesses who spoke only Spanish were sworn en masse by the Court along with a large number of other witnesses and "the oath [was not] administered to each witness after he [had] taken his place in the witness box." It was this procedure which alone prompted Judge Murrah's dissent. 231 F.2d at 388. That confusing situation was not present in this case. Each witness was called individually and was either sworn or dismissed individually. Under these circumstances, Judge Murrah, under his reasoning, would have found waiver.

*Muller v. State,* (Okla.Cr.App.1969) 456 P.2d 903, 906, *cert. denied,* 396 U.S. 987, 90 S.Ct. 482, 24 L.Ed.2d 451; *State Bar of Georgia v. Ellis,* 116 Ga.App. 721, 158 S.E.2d 280, 285 (1967); *Thomas v. Dad's Root Beer & Canada Dry Bottling Co.,* 225 Or. 166, 357 P.2d 418 (1960) ("No objection was raised by counsel to the fact that the witness was not sworn. This clearly constituted a waiver."); *State ex rel. Tucker v. Alvis,* 55 Ohio L.Abs. 285, 89 N.E.2d 328, at 328 (1949) ("When a defect such as alleged here is known at the time, the defect must be taken advantage of at once and the failure to do so is such acquiescence in the testimony as will preclude objection after the verdict."); *South Texas Inv. Co. v. Harrison,* 194 S.W.2d 587, 592–93 (Tex.Civ.App.1946); *In re Da Roza's Estate,* 82 Cal.App.2d 550, 186 P.2d 725, 728–29 (1947); *Mettetal v. Hall,* 288 Mich. 200, 284 N.W. 698, 701 (1939); *Trammell v. Mount,* 68 Tex. 210, 4 S.W. 377, 379 (1887).

■ Both of these reasons stated in *Cady* and applied in *Wilcoxon* for finding waiver are present in this case. As the Court said in *Wilcoxon,* these defendants and their counsel had a duty to object to the failure to swear them at the time these witnesses were heard in order to afford the district court an opportunity to correct the omission. They did not object when the witnesses were called to the stand, when they were examined or immediately after they left the witness box. When the district judge called the omission to their attention the day after these witnesses had been called, then and then only did they object by moving to strike the testimony. The district judge responded, as was eminently proper, by stating that he would recall the unsworn witnesses and swear them, thereby remedying the prior omission.[11] After having the omission called to their attention, counsel for the defendants held a conference, and, after consideration, made the strategic decision to withdraw their objections rather than have the witnesses recalled and sworn. There could not be, it would seem, a clearer case of waiver. The defendants accordingly may not be heard now to object to what they voluntarily and knowingly refused at trial to object to. The right to object to the failure to swear the witnesses was clearly waived.[12]

V

■ The defendants would fault the district judge for describing to the jury the procedure under the North Carolina statutes for absentee voting. As we have seen, the charge against the defendants was that they had violated federal law by engaging in a conspiracy to fraudulently misuse the North Carolina absentee voting law in an election where candidates for a federal office were being voted for and in which there was a use of the United States mails. There is nothing unusual in the fact that a violation of a state statute may be involved in a federal election prosecution. *U.S. v. Mandel,* 591 F.2d 1347, 1358 (4th Cir.1979), *cert. denied,* 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980). *See also,* Donsanto, *Federal Jurisdiction Over Local Vote Fraud,* 13 U.Balt.L.Rev. 1 (1983). Such was the situation in a recent case in this Circuit which parallels to some degree this prosecution.[13] Nor was there anything

---

**11.** Such was the situation in *Saxton v. State, supra,* 389 So.2d at 543, where waiver was found.

**12.** It is likely that such statements as were made by these witnesses in their testimony which was brief were not prejudicial to the defense of the defendants. Five of them actually said nothing; the other four so contradicted themselves that it was obvious that nothing they said could be relied on. What was "prejudicial" to the defendants in connection with these witnesses was the "manifest implication" their appearance and lack of comprehension made inescapable that they had not and could not knowingly have voted or authorized the defendants on their behalf to vote absentee. But that was "prejudice" that was inherent in the evidence and provides no basis for a claim of error by the defendants.

**13.** *See, United States v. Schafer,* 726 F.2d 155 (4th Cir.1984), in which the defendant had been convicted of "bribing voters and submitting false and fraudulent absentee ballots through the mails during an election in Dillon County, South Carolina." *Id.* at 156.

improper in the district judge explaining to the jury the state voting law in order to aid them in resolving the federal charge. This is particularly so since extensive expert testimony about the North Carolina law had been admitted without objection.

It, of course, would have been error had the district judge gone beyond explaining the provisions of the North Carolina law, and instructed the jury that they could convict simply for a violation of the state statute. The district judge did not commit such an error. Nor did the jury fail to understand that the only charge on which the defendants could be convicted was the federal charge under the mail fraud statute. That was demonstrated by an inquiry of the jury to the court in the course of their deliberations. They asked for "a full explanation of mail fraud." The district judge gave an explanation of the federal statute, to which there was no exception. In concluding his explanation, the district judge made it crystal clear again that "the offense which we're talking about ... is Section 1341, Title 18, the mail fraud [statute], that the Defendant[s] wilfully and knowingly devised a scheme or artifice to defraud and that the defendant[s] used the United States Postal Service by mailing or causing to be mailed some matter or thing for the purpose of executing a scheme to defraud." There could have been no possible misunderstanding by the jury of the fact that the defendants were being charged only with a violation of federal law. We accordingly find no error in the district court's mere explanation of the North Carolina law on absentee voting.

## VI

■ Complaint is made of a remark by the United States Attorney at the beginning of his jury summation. The statement was:

"I'm calling upon you to look at the credibility of the Attorneys for the Defendants. One after another has come

up to you and dishonestly stated the facts to you."

The Government does not dispute the impropriety of this statement. The defendants promptly objected to the statement and the district judge as promptly stopped the United States Attorney and summoned him, along with defense counsel, to the bench where the United States Attorney was told that his remarks were improper. In his instructions, the district judge told the jury that they "should not consider the remarks of the U.S. Attorney as to the credibility of the attorneys for the Defendants.... That is not a proper argument. The attorneys for the Defendants have a right and, in fact, a duty to present the contentions of their respective parties, just as the attorneys for the Government have that right and that duty. The remarks of the U.S. Attorney have no place in the trial, and I'm sure they were unintentional because of the pressures which attorneys usually go through in trying a case."

A charge of prosecutorial misconduct in statements or remarks made either in jury summation or during trial is an issue which has arisen in many cases. What is new in this case is that the defendants seek not a new trial but an acquittal because of the alleged misconduct. Patently the defendants would not be entitled to an acquittal even if there were such prejudicial prosecutorial misconduct, nor are they entitled to a new trial on account of the alleged misconduct.

The circumstances under which a retrial may be ordered because of prosecutorial misconduct in the form of comments of the prosecutor have been delineated by this court in a number of recent cases. One of the most important circumstances in assessing such a claim, according to the authorities, is whether the improper remark or statement was repeated or was merely an "isolated" statement and " 'not at all reflective of the quality of the argument as a whole.' " The extent of the intemperate remark is also an important consideration.[14]

---

14. *United States v. Elmore,* 423 F.2d 775, 781 (4th Cir.1970); citing *United States v. Socony-* *Vacuum Oil Co.,* 310 U.S. 150, 242, 60 S.Ct. 811, 853, 84 L.Ed. 1129 (1940).

The remark complained of in this case consisted of two short sentences covering three lines in the United States Attorney's summation, which itself covered eighteen pages in the transcript. We are directed to no other point either in the summation or in the trial itself where the United States Attorney or his assistants transgressed the bounds of propriety in their remarks. The statement was plainly an "isolated" remark in an extensive trial. Although an improper comment and an impermissible criticism of defendants' counsel, it was not permeated with such uniquely prejudicial character as are, for instance, appeals to racial prejudice, which were appropriately condemned in *Miller v. North Carolina*, 583 F.2d 701, 706–07 (4th Cir.1978).[15] It did not refer to the central issues in the case or even to the defendants themselves, a point noted in *United States v. Leon*, 534 F.2d 667, 679 (6th Cir.1976). Further, this was not a "close" case, a factor suggested in *United States v. Harrison, supra*, 716 F.2d at 1052: the "strength of [the] competent proof introduced to establish the guilt of the accused" was overwhelming. Nor could there have been any intent by the remark "to divert attention to extraneous matters," *United States v. Harrison, supra*, 716 F.2d at 1052; the remark was in response to what the United States Attorney believed had been misstatements of the record by counsel for the defendants.

Finally, the manner in which the district judge handled the matter dissipated any possible prejudice that the defendants may have suffered as a result of the remark. He immediately stopped the United States Attorney and summoned him to the bench. When he resumed, the United States Attorney confined himself to the facts and omitted any personal reference whatsoever to counsel. The jury unquestionably recognized that the United States Attorney had been admonished about his remark. If there were any doubt on this score it was later removed by the instruction given by the district judge. Under all the circumstances, we find no basis for requiring a

retrial because of this one short and "isolated" remark of the United States Attorney in a protracted trial.

## VII

The other claims of error by the defendants, which allege variance between the proof and the indictment and which charge that there was inadequate proof of a claim of custody of the disputed ballots, are completely without merit. Any variance between indictment and proof which does not modify the elements of the crime charged will not invalidate a conviction unless it prejudices the defendant. *United States v. Somers*, 496 F.2d 723, 744 (3d Cir.1974). The defendants contend that proof of voting established wrongful voting in both October and November, though the indictment charges only double voting in October. The fraudulent acts all occurred in October. The alleged voting took place on October 28. It is true that the actual counting of ballots in the election occurred in November but, in fact, the absentee voters had "voted" earlier in October. Moreover, the indictment uses the term "about October." The claim of fatal variance is completely without merit. So far as the proof of custody of the disputed ballots is concerned, we find the proof adequate.

## CONCLUSION

Having considered all the defendants' claims of error and finding none requiring a reversal, we affirm the judgments of convictions.

AFFIRMED.

HARRISON L. WINTER, Chief Judge, concurring:

I concur in the judgment and in the majority opinion, except for the portion of Part IV dealing with the receipt of unsworn and incompetent testimony. I agree that defendants waived the errors in this regard committed by the district court.

---

**15.** *See also, United States v. Harrison*, 716 F.2d 1050, 1052 (4th Cir.1983); *United States v.*   *Weatherless*, 734 F.2d 179 (4th Cir.1984) (decided May 14, 1984).

Since my reasoning as to the nature of the waiver differs from that of the majority, however, I state it separately.

## I.

The record is not clear as to when defendants first learned that the residents of the rest home would be called as government witnesses. For all that appears, defense counsel first received this knowledge at a conference in chambers immediately before the trial began, or, more probably, at or around the luncheon recess during the first day of trial. If I read the record correctly, counsel cannot be faulted for delay in formally requesting that the competency of the witnesses to testify be explored out of the presence of the jury.

I agree with the majority that the district court had discretion to determine the competency of the witnesses in the presence of the jury. It was a perilous course for the district court to follow, however, because the district court permitted some of those of the unsworn witnesses who were able to speak not only to answer questions reflecting their competency to testify but also questions going to the merits of the prosecution. The government was permitted to ask some of the witnesses about their recollection of voting and the defense was permitted to show that some of the witnesses wanted to vote the way defendants allegedly illegally caused them to be recorded as voting. The district court ruled that some of the witnesses were not competent to be sworn.

Were there nothing more on this issue, I would be inclined to hold that the district court exceeded its discretion in declining to examine the competency of these witnesses to testify, since the examination proceeded as it did, *in camera.*

## II.

While I agree with the majority that as a general proposition of law an objection to the competency of a witness to testify can be waived, I do not agree that waiver occurred here as found by the majority. When the district judge precipitated the objection to competency on the day after the unsworn witnesses had testified, he made it quite clear that if the objection were pressed, he would deny it and simply recall the witnesses to be sworn and, presumably, to repeat their prior testimony. Understandably, counsel withdrew the objection because, as I have indicated, the unsworn witnesses gave substantive testimony relevant to the crimes with which defendants were charged.

I do not think that withdrawal of the objection under these circumstances constituted waiver. Clearly counsel was in a "catch-22" situation. Counsel could withdraw the objection or else run the risk that the testimony unfavorable to defendants would be repeated and the prejudice to defendants magnified by having the witnesses recalled to repeat their testimony under some ostensible form of oath. At the same time, the failure to swear these witnesses was not defendants' real objection; rather, it was that these witnesses were so incompetent that they could not genuinely be sworn. Counsel was compelled to withdraw their objection to the unsworn witnesses in order to prevent the repetition of the witnesses' incompetent testimony before the jury. To me, the "strategic decision to withdraw their objection" was sufficiently coerced that I cannot treat it as a free and voluntary act.

I do, however, conclude that there was a subsequent waiver of the objection. In its instructions to the jury, the district court stated:

You have heard the testimony of most of the residents of the nursing home whose absentee ballots were alleged to have been sent to the Elections Board in the November, 1982, election. You may be wondering whether the obvious mental deficiencies of these residents should make any difference. Some of those people were in such condition that they could not understand the meaning of the oath and, therefore, the Court did not ask that they be sworn, since they could not respond to an oath. What you must determine, as with any other witness, is

whether their testimony is believable. Did he or she understand the questions. Did he or she have a good memory. Is he or she telling the truth. Because people with mental deficiencies may not fully understand what is happening here, it is up to you to decide whether they understood the seriousness of their appearance as a witness in a criminal trial. In addition, mentally deficient persons may be influenced by the way questions are asked. It is up to you to decide whether they understood the questions asked of them. Keep this in mind when you consider their testimony, if any, as given in the responses which were made by them, if any.

Although this instruction may be read to convey the district court's view that the unsworn witnesses were unbelievable, the jury clearly also was told that it was free to rely on the testimony of unsworn witnesses in convicting (or acquitting) defendants.

Surprisingly enough, there was no objection to the charge. As far as the record reflects, there had been no prior request by defendants for the district court to instruct the jury to disregard the testimony of unsworn witnesses. For all that appears, if such a request had been made, it might have been granted.

We may not consider issues not preserved for appeal, except in the event of plain error. Fed.R.Crim.P. 52. Since, as established in the majority's opinion, the competency of unsworn witnesses to testify is an objection that can be waived, I would not find plain error by the district court. Accordingly, I join the majority's conclusion that defendants did not preserve their objection to the receipt of the testimony of the unsworn witnesses.