UNITED STATES of America,
Plaintiff-Appellee,

v.

Salvador E. PEREZ,
Defendant-Appellant.

No. 80–1552.

United States Court of Appeals,
Fifth Circuit.
Unit A

July 17, 1981.

Abel Toscano, Jr., Harlingen, Tex., Roy Beene, Houston, Tex., for defendant-appellant.

John M. Potter, Asst. U. S. Atty., Houston, Tex., for plaintiff-appellee.

Before GEE, TATE and WILLIAMS, Circuit Judges.

GEE, Circuit Judge:

The defendant, Salvador Perez, was a deputy constable for Cameron County, Texas, in 1978. As one long connected with law enforcement, he was approached in February 1978 by Rosa Maria Hinojosa, who requested him to assist in procuring the release of her brother, Aroldo Hernandez, and her sister-in-law, Ester Hernandez, from prison.

Hinojosa testified that Perez told her that he knew the district judge who had sentenced her relatives to prison on drug charges, the judge's chief probation officer, and the prosecuting attorney in her relatives' case, and that he needed money to "wine, dine, and buy gifts" for these officials in order to secure the release of her relatives. Hinojosa gave a total of $1,600 to Perez ($1,000 on one occasion and $600 on another) for this purpose.

Hinojosa also testified that Perez informed her that an additional $5,000 would be needed later to pay off the sentencing judge, but that this sum could be paid after her brother's release.

Aroldo and Ester Hernandez, the two federal prisoners who sought to obtain an early release, testified that they called Perez (Aroldo, twice, from Leavenworth, Kansas, and Ester from Alderson, West Virginia) collect, by prearrangement, to obtain their early release. Telephone records introduced in evidence confirm that calls were made to the Perez home during the period of time indicated from these institutions.

The judge, the probation officer, and the prosecutor each testified that he was at no time aware of any efforts on the part of the defendant Perez to gain the early release of the Hernandezes. In fact, none of these individuals had *any* contact with Perez during the applicable time period, and his story of contacts with them was a complete fabrication, made up out of whole cloth. Eventually Mrs. Hinojosa went to the Cameron County Sheriff's office, which notified the FBI. Its investigation resulted in indictments of Perez on three counts correspond-

ing to the three long-distance calls mentioned above.

A jury found Perez guilty on these three counts of violating 18 U.S.C. § 1343, which reads as follows:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

He appeals on grounds of evidentiary insufficiency, of exclusion of evidence of witness bias, and of the omission to swear an interpreter.

### Exclusion of Evidence and Counsel's Exchange with the Court

Appellant Perez' most troublesome contentions stem from an exchange between his counsel and the trial judge. This occurred late in the case, during the presentation of the defense witnesses, when counsel was questioning an agent of the FBI who participated in the investigation of Perez' case. Pursuing his theory that Perez' prosecution was instigated by the Cameron County Sheriff's office in retaliation for Perez' having run against the incumbent sheriff, counsel proceeded with questioning as follows:

Q. And who was the Sheriff of Cameron County back in January of 1979?

THE COURT: Excuse me. What is the relevance of this?

MR. TOSCANO: Your Honor, I am trying to show the source of this complaint that came about, how these people are complaining that said we never complained and we were brought into this by the people from the Sheriff's department.

THE COURT: What difference does that make?

MR. TOSCANO: Well, it shows, Your Honor, that these people have never considered themselves as the government alleges that they were.

THE COURT: They what, now?

MR. TOSCANO: That these people never complained to anyone about what the government is alleging that this man did to them.

THE COURT: Well, so what?

MR. TOSCANO: Well, it helps at least the jury to determine whether or not there is any believability in what they say.

THE COURT: That has nothing to do with the case. Your worst enemy can rat on you if you have done something wrong. That doesn't make any difference. If somebody knows you did something wrong and tells the FBI about it, and the FBI investigates it, what difference does that make? It's a question of whether or not he did something wrong.

MR. TOSCANO: If the Court feels the political implications involved or surrounding this particular case—

THE COURT: There are no political implications to it at all. This man is not charged with any political crime. He is charged with having defrauded some people and using the telephone in the course of the fraud. There is nothing political about this.

MR. TOSCANO: We submit it is, Your Honor.

THE COURT: Well, I will tell you right now I am going to tell this jury there is not. That's an incorrect statement. There is nothing about politics in this indictment. This man is charged with a crime of violating federal laws, and that's what this jury is going to decide. We are not going to have a Sheriff's race in this courtroom. Just don't get into that at all, because I will instruct the jury as to why Mr. Perez is here. Mr. Perez is here because he got indicted by a federal grand jury for certain violations, and, as jurors, you are going to decide whether or not he is guilty of

these violations. It has nothing to do with his being a political candidate or anything of the kind.

Don't go into that any more, because you are just making this thing more complicated than it is and has nothing to do with the case.

MR. TOSCANO: We take exception to the Court's ruling, sir.

THE COURT: That is certainly all right. You may take your exception.

BY MR. TOSCANO:

Q. Were you present in Harlingen, Texas, when Rosa Hinojosa, her father, Julian Hernandez, and Yolanda Hernandez were questioned?

A. Yes, sir, I was.

Q. Do you recall who else was present, sir?

A. Yes, sir. To the best of my recollection, there was Joe Alvarado, George Gavito—

THE COURT: Just a minute. I am not going to let you go into that. What is the purpose of that question, who was present when this investigation started, Mr. Toscano?

MR. TOSCANO: Your Honor, I am entitled to know just who these people are so I can ask them in the event I can talk to them and find out if there are any possible inconsistencies, anything that would help this Court and jury to determine—

THE COURT: You are not helping the Court at all by this line of questioning, and anyone that has testified or that you anticipate calling as a witness—the only thing I know of that this man can testify about would be any inconsistencies in any testimony that has already been said if you know of any.

You can ask him about witnesses told him, if there is something inconsistent.

But how the investigation came about or who was present is irrelevant, or what forces motivated anybody to bring this investigation on is all irrelevant.

MR. TOSCANO: Please note our exception, Your Honor.

Based on this colloquy, Perez makes three somewhat intertwined complaints: that the judge's reproving remarks to him and instructions to the jury, quoted above, were improper and prejudicial; that their effect was to prevent him from exploring bias of the Hinojosa and Hernandez witnesses; and that they prevented him as well from showing the jury that the report of his alleged misdeeds to the FBI was motivated by political malice.

■ The last complaint is meritless. The motives upon which informants act in reporting crimes are generally irrelevant except as they go to witness bias. Police need not disregard all such reports except as are filed by the pure in heart,[1] and the court correctly refused to permit counsel to pursue this inconsequential issue.

■ Nor do we find the manner of the court's mild admonitions to counsel improper, unfair, or repressive, as they are characterized by appellant. As we have often observed, federal judges are responsible for the tone and tempo of proceedings before them, not mere moderators or hosts at a symposium. *E. g., Moore v. United States,* 598 F.2d 439, 442 (5th Cir. 1979); *United States v. Davis,* 546 F.2d 617, 622 (5th Cir. 1977). Tendencies in counsel to pursue irrelevant matter are fully subject to control by the court, as are impertinent or side-bar remarks; and while the conduct of counsel in this proceeding was scarcely boisterous, neither was it such as to merit a slack rein.[2] More than once during the proceedings the

---

1. Perez' contention is not one of selective prosecution. Such a defense is difficult to establish, and requires proof of elements not shown here. Moreover, one may hope with reason that there are not so many lawmen in the Southern District of Texas who engage in such practices as Perez' as to present a field for selection.

2. At various points in the record counsel permitted himself to refer to a witness as a "liar" and to testimony as "coerced," or as smacking of a "bribe." Rulings of the court were sometimes ignored, for which counsel sometimes apologized.

court advised the jury that its comments of this sort did not reflect upon the defendant or on the court's impartiality in the case. We find no error in the tenor of the court's dealings with counsel.[3]

It remains to consider the final contention of the three, that the substance of the court's ruling unduly restrained the defense in its effort to demonstrate bias in the Hinojosa and Hernandez witnesses. It was, broadly speaking, defense counsel's theory of the case that the payments made to Perez by Mrs. Hinojosa were advances on legal fees for a lawyer whom he was to procure to assist her imprisoned relatives and, being such, were not, as the prosecution contended, mere extortions for his own benefit, exacted on the pretense of spurious projects underway to wine, dine, and bribe the authorities to release the relatives. Pursuing that theory, counsel sought to show that Perez was a political opponent of and persistent candidate against the incumbent county sheriff; that deputies in his office received, perhaps even solicited or inspired, the initial complaints about Perez' conduct and passed them on to the FBI, thus instigating the prosecution of Perez; and that the retaliatory motives of the sheriff's men were thus transferred to the Hinojosa and Hernandez witnesses, causing them to mischaracterize his innocent efforts to help their relatives by proper legal means and channels. Tenuous though it may be, this theory of witness bias is neither improper nor irrelevant; and counsel was entitled to attempt to persuade the jury to accept it. A careful reading of the entire record convinces us, however, that the court permitted counsel sufficient latitude in introducing evidence to support his theory of witness bias. Counsel was permitted to establish the identities of the sheriff's officers who were present at the initial FBI interview with Mrs. Hinojosa and that she was an acquaintance of one of them who had urged her to report Perez to the authorities. Perez' status as a candidate for the sheriff's office was shown, as was the fact that she had feared to make a report of the incidents because Perez had told her not to until sheriff's officers urged her to do so.

In the exchange of which he complains, we are unable to determine what further matter counsel may have sought to establish by Special Agent Diaz, since no offer of proof was made. *See United States v. Love*, 599 F.2d 107, 108–09 (5th Cir. 1979). Judging as best we can from the questions that he asked and that the court ruled out, he merely sought to show again the identity of the incumbent sheriff and that various sheriff's officers were present at the initial interview with Rosa Hinojosa, matters already established in the record. The trial court enjoys a wide discretion as to such matter, *United States v. Love, supra; United States v. McCann*, 465 F.2d 147, 163 (5th Cir. 1972), and we have concluded we cannot say that it was abused in this instance. The court specifically advised counsel, moreover, that he was free to question Agent Diaz regarding any inconsistencies in the witnesses' statements, given at the interview, with their trial testimony, a course that counsel declined to follow. Finally, a careful reading of the court's remarks to counsel fails to demonstrate any significant disparagement of counsel's theory of proof of witness bias. Instead, the court merely advised those present that Perez was not being tried for his politics but for a violation of federal law and that the motives that led the sheriff's office to investigate his actions were not relevant to his guilt or innocence. Nowhere do we find any indication by the court that the bias of a witness was not a proper subject for exploration. There was no error here.

### Other Complaints

Two other points are offered for reversal, neither of which requires extensive treatment. The record does not reflect that an interpreter who translated the questions to and answers of two crucial prosecution witnesses, Hinojosa and Hernandez, was sworn, as required by Rule 604, Federal Rules of Evidence. Since the record like-

---

**3.** The prosecution took some light fire as well, equally justified in the circumstances.

wise fails to reveal any objection to this apparent omission, however, Perez is reduced to the argument that it was plain error, subject to notice in the absence of objection. Rule 52(b), Federal Rules of Criminal Procedure. We cannot agree.

■ As a general rule, even in a criminal case errors of the trial court will not be noticed on appeal unless they have been called to the judge's attention when made, with a statement of why counsel believes the action taken to have been erroneous. Rule 51, Federal Rules of Criminal Procedure. This salutory rule has its roots in obvious considerations of finality of the criminal trial process, of judicial efficiency, and of avoiding trials by ambush. A limited exception is provided by Rule 52(b), permitting appellate notice of "[p]lain errors or defects affecting substantial rights" though they were not objected to at trial. Professor Wright notes [4] that this is a restatement of prior law, citing the observation of Justice Stone, in 1936:

> In exceptional circumstances, especially in criminal cases, appellate courts, in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity, or public reputation of judicial proceedings. *United States v. Atkinson*, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936).

■ It thus appears that our notice of such error is limited to those harmful ones that were so rank that they should have been apparent to the trial judge without objection, or that strike at the fundamental fairness, honesty, or public reputation of the trial.[5]

■ It has long been the general rule that even a failure to swear a witness may be waived. This may occur either by knowing silence and an attempt to raise objection after verdict [6] or by the mere failure of counsel to notice the omission before completion of the trial.[7] If this be true of a witness, one who may and often does have an interest in the outcome of the trial and who may therefore require the admonition of an oath "in a form calculated to awaken his conscience and impress his mind" [8] with his duty to tell the truth, how much more so of an interpreter. Such court functionaries stand somewhere between an expert witness called by the court and the court reporter. As to such persons, the fundamental question is normally one of qualification, not of veracity or fidelity. In the absence of special circumstances, the latter qualities are assumed. No such circumstances appear here. The omission has been waived.

■ Finally, Perez objects that the evidence is insufficient to sustain one element common to all those counts of which he was convicted: that the telephone calls made to Perez furthered his scheme to defraud Rosa Hinojosa. In view of the failure of Perez to renew his motion for judgment of acquittal at the close of all the evidence, our review pursuant to this complaint is limited to preventing a manifest miscarriage of justice. *United States v. Robbins*, 623 F.2d 418 (5th Cir. 1980); *United States v. White*, 611 F.2d 531 (5th Cir. 1980), and cases cited at 536.[9]

---

4. Wright, *Federal Practice and Procedure: Criminal* § 856.

5. It has long been the rule of our circuit that Rule 52(b) "is to be invoked only in exceptional circumstances to avoid a miscarriage of justice." *Eaton v. United States*, 398 F.2d 485, 486 (5th Cir. 1968).

6. *Beausoliel v. United States*, 107 F.2d 292 (D.C. Cir. 1939).

7. *Wilcoxon v. United States*, 231 F.2d 384 (10th Cir. 1956).

8. Rule 603, Fed.R.Evid.

9. An interesting question, which is not briefed and which therefore we need not decide, is whether this standard equates functionally with that, laid down by the Supreme Court long since the articulation of our rule, for reviewing sufficiency of evidence in habeas corpus proceedings: whether, drawing all reasonable evidentiary inferences in favor of the state, the court must still conclude that *no* rational trier of fact "could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 2792, 61 L.Ed.2d 560 (1979).

We have reviewed the evidence by this standard. We conclude that the jury could reasonably have inferred that the long-distance calls made to Perez from the prisons at Leavenworth and Alderson, West Virginia, were caused by him as part of his scheme to defraud Rosa Maria Hinojosa. Indeed, the evidence of this element of his crimes, viewed most favorably to the verdict of conviction, was sufficient even under normal standards of evidentiary review. A fortiori, there was no manifest miscarriage of justice.

AFFIRMED.