**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

**No. 97-11285**
_____

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**versus**

**ROSELLER FRANCO, also known as Roy Franco,**

**Defendant-Appellant.**
_____

**Appeal from the United States District Court**
**for the Northern District of Texas**
**(3:97-CR-37-R-4)**
_____

June 10, 1999

Before GARWOOD, BARKSDALE, and BENAVIDES, Circuit Judges.

PER CURIAM:[*]

For Roseller Franco's challenge to his conviction for conspiracy to commit mail fraud, primarily at issue are the district court's comments on the evidence and its criticisms of defense counsel. We **AFFIRM**.

I.

Fifteen persons and Franco, who served as office manager for two law offices, were indicted for conspiracy to commit mail fraud, in violation of 18 U.S.C. § 371, and for conspiracy to launder money, in violation of 18 U.S.C. § 1956(h). Because all of

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Franco's co-defendants were either fugitives or pleaded guilty, the case proceeded to trial solely against Franco.

At trial, the Government presented evidence of Franco's participation in a scheme in which runners recruited "victims" to participate in staged automobile accidents; medical providers generated false medical records and bills for the "victims"; law office personnel, including Franco, used the false medical records and bills to make claims against insurance companies on behalf of the "victims"; proceeds from settlements were divided among the participants in the scheme; and the medical clinics and law offices made a second round of kickback payments to investors who had financed the scheme.

Franco testified. He admitted filing insurance claims, making cash payments to runners, and paying and receiving kickbacks, but denied knowing either that the accidents were staged or that the claims were fraudulent.

The jury convicted Franco for conspiracy to commit mail fraud, but acquitted him on the money laundering conspiracy charge. Franco was sentenced, *inter alia*, to 60 months imprisonment and was ordered to pay approximately $2.7 million in restitution.

## II.

Franco maintains that the district court violated its duty to conduct the trial impartially; that it erred by refusing his requested instruction on reasonable doubt; and that a Government witness' testimony should have been suppressed because it was obtained in violation of 18 U.S.C. § 201(c)(2).

A.

Franco, represented by the Federal Public Defender on appeal, charges that the district judge deprived him of a fair trial by unfairly criticizing Franco's retained trial counsel, Raymond Jobe, and by improperly commenting on the evidence in the jury's presence. Asserting that such comments and criticisms unfairly prejudiced his defense, he points to the initially deadlocked jury as demonstrating that the Government's proof was not overwhelming.

The Government counters that Jobe's disruptive conduct (repeated refusal to follow the district court's instructions, inappropriate and unfair comments in the presence of the jury, unnecessarily formal and time-consuming objections, and use of disingenuous tactics to confuse the jury) necessitated the court's actions in order the control the courtroom; that the comments on the evidence were legitimate and appropriate to avoid unnecessary confusion of the jury caused by Jobe's inappropriate and unprofessional tactics; and that Franco was not prejudiced, because the court's comments were directed at Jobe, not Franco.

Federal district judges "have wide discretion with respect to the tone and tempo of proceedings before them; they are 'not mere moderators or hosts at a symposium'". *United States v. Adkins*, 741 F.2d 744, 747 (5th Cir. 1984) (quoting *United States v. Perez*, 651 F.2d 268, 271 (5th Cir. 1981)), *cert. denied*, 471 U.S. 1053 (1985).

> The trial judge has a duty to conduct the trial carefully, patiently, and impartially. He must be above even the appearance of being partial to the prosecution. On the other hand, a federal judge is not a mere moderator of proceedings. He is a common law judge

having that authority historically exercised by judges in the common law process. He may comment on the evidence, may question witnesses and elicit facts not yet adduced or clarify those previously presented, and may maintain the pace of the trial by interrupting or cutting off counsel as a matter of discretion. Only when the judge's conduct strays from neutrality is the defendant thereby denied a constitutionally fair trial.

*Id*. at 747-48 (footnotes omitted) (quoting ***Moore v. United States***, 598 F.2d 439, 442 (5th Cir. 1979)). And, "even if the trial judge does commit error in such a respect, the complaining party must prove that the error was substantial and that it prejudiced his case". *Id*. at 748; *see also* ***United States v. Lance***, 853 F.2d 1177, 1182 (5th Cir. 1988).

Franco lists what he considers "the more egregious examples of the trial judge's remarks". We address each; but, of course, "in determining whether a trial judge overstepped the bounds of acceptable conduct-that is, violated his duty to conduct the trial impartially-we must view the proceedings as a whole". *Id*. (internal quotation marks and citation omitted).

1.

a.

First, Franco complains that his counsel's insistence on obtaining rulings on objections antagonized and irritated the district judge, resulting in his criticizing counsel in the presence of the jury. Franco quotes the following colloquy:

> MR. JOBE: I object to the Court's comments respectfully.
>
> THE COURT: Fine. The record is clear, but just move ahead.

MR. JOBE: I apologize. I respectfully object to the Court's comment as a comment on the weight of the evidence. Would ask for a ruling respectfully on that objection.

THE COURT: No. You know you must not practice in federal court. You don't have to ask. The rulings are automatic. What I've done, your record is clear and you've got a record, and you can appeal on it. You don't have to make those kind of objections. This isn't state court. Just proceed.

MR. JOBE: Your Honor --

THE COURT: Will you ask the questions, please, Mr. Jobe?

MR. JOBE: Your Honor, I'm a poor lawyer, but I have to do what I think is best for my client. Respectfully I'm doing that. So I object to the Court's not making a ruling on the objection. I'm going to proceed.

THE COURT: Please do. Please, please do.

As the Government notes, Franco omits what immediately preceded this exchange. Most of the defendants were Filipinos. Jobe was cross-examining Arlene Patacsil, a Filipino co-defendant, who had just testified about her discussions with other co-defendants regarding staging automobile accidents. The following occurred immediately prior to the above-quoted comments:

Q [by Mr. Jobe] Is it your testimony to this jury that everybody that has any Philippine blood in them is guilty in this case?

[PROSECUTOR]: Objection.

THE COURT: Now that is a totally inappropriate question, and you know that, Mr. Jobe.... Now just move on to another question. If you want to ask her if every law office manager who happens to be a Philippine name, that's one thing. But she's never

> insinuated nor has the government insinuated
> that everybody who's Philippine is crooked.
> That's obviously wrong. There are lots of
> honorable Philippines in this country. That's
> a slam on a race, and that's not right.
> Question hard as you want about this case.

Franco asserts that similar exchanges occurred throughout the trial, with Jobe objecting, the district judge telling him, "Fine", or "Move along", and Jobe objecting to the lack of a ruling. The Government counters that Jobe's insistence on the formalistic and unnecessary procedures of Texas state courts, in disregard of the district court's instructions, was a disingenuous attempt to provoke the court's displeasure and thereby seek to incur sympathy from the jury.

In any event, based on our review of the record, the district judge did not criticize Jobe unfairly. Contrary to Franco's portrayal, the court's criticism was not directed solely at Jobe; the prosecutors were also admonished by the court on quite a few occasions. The example cited by Franco is merely one of numerous instances in which the district court diligently, and quite properly, exercised its prerogative to move the trial forward expeditiously and efficiently.

### b.

Next, Franco complains of the following comment by the district judge to Jobe, in the jury's presence:

> You know if you poor-boy me too much more,
> I'll give you a chance to get another lawyer
> if you think you're having that much trouble.

As always, this comment must be considered in context. When it occurred, Jobe had been examining the case agent, Clarke, called

by Franco as a hostile witness, about other Government investigators' notes of their first interview with Franco's co-defendant, Arlene Patacsil. Jobe sought to establish that Patacsil had not mentioned Franco in that interview. Although both Patacsil and Clarke had been questioned previously about that subject, Jobe persisted:

> Q    Well, you know strangely enough, I don't know whether you noticed it, but I noticed it. Strangely enough, Ms. Patacsil never implicated my client until her lawyer wasn't present. If you'll look at these reports that you generated --
>
> [Prosecutor]:  Is that a question?
>
> Q    (By Mr. Jobe) Yes, I'm going to ask you to confirm that. Confirm that for me if you would.
>
> We have this -- first, this is when you raided the clinic. This is when you first raided the clinic. You said, do you have a lawyer at that time. I shouldn't say "you." When the government raided this clinic, that's the first interview, and Ms. Patacsil doesn't mention my client at all. You don't dispute that, do you?
>
> A    Again, I wasn't present during this interview. I was at a different clinic.
>
> Q    Sir, you can look at the record and determine whether you dispute that, can't you?
>
> A    I can take time to review it.
>
> Q    Well, that's all right. Do you doubt that she did?
>
> A    I haven't read the memo, sir.
>
> Q    You never read the memo?
>
> A    No, sir.

Q    You mean before you interviewed Ms. Patacsil, you never read the memo when you did before?

A    No, sir, I just heard she had made some incriminating statements and that she would be somebody we would follow up on talking to.

Q    Go ahead and take your time.  Do you see in that first interview she even mentioned Mr. Franco?

     [Prosecutor]:  Your Honor, I'm going to object at this point.  I think it's been established.  It's cumulative.

     THE COURT:  Sustained.

     MR. JOBE:  Your Honor, I cannot ask the question?

     THE COURT:  No, you've already asked it several times, and he has told you.  There's nothing in here where she puts the finger on your client on the first interview.  Let's go on.

Q    (By Mr. Jobe) February 20, 1996, this is the interview where you –

     [Prosecutor]:  Objection, cumulative, Your Honor.  We've been over and over this.

     THE COURT:  Done the same thing.  Why don't you pick the one where you say, Mr. Jobe, is the first time she tried to point the finger at him and then let him dispute.

     MR. JOBE:  Well, Your Honor, I'm doing the best job I can with what I've got.  I'm sorry if –

     THE COURT:  You know if you poor-boy me too much more, I'll give you a chance to get another lawyer if you think you're having that much trouble.  Now go back to the stand and ask the question, isn't it a fact the first time she put the finger on my client was at the interview of blank date.

Q    (By Mr. Jobe) Isn't it true that the first time Ms. Patacsil put the finger on my

client was at the interview on July 19, 1996?

Considered in the context of the record, and especially of Jobe's repetitious questioning, the district court's criticism was not unwarranted; again, the court was more than justified in attempting to move the trial forward.

c.

The next example cited by Franco also occurred during Jobe's examination of Agent Clarke. When Jobe objected that the witness' answer to a question was non-responsive, the court responded:

> No, you asked him an argumentative question.
> He gave you an argumentative answer.  A pox on
> both of you.

Franco asserts erroneously that the "pox" comment was directed at his counsel, not at the Agent.

Again, Franco has taken the quoted remark out of context.  The Agent had testified previously that he had prepared summaries of the fraud amount based on the intended loss – the initial settlement demand to the insurance company, which he estimated at three and one half times the amount of the medical bills.  Jobe was attempting to establish that the settlement demand was usually larger than either the subsequent settlement or the actual loss.

> Q    You're basing your calculation of fraud
> on what you have calculated is what, in your
> opinion, based on Ms. Patacsil and based on
> other sources, unidentified sources in the
> insurance industry, you believe these people
> may have wanted, right?  Is that what your
> testimony is in terms of a demand?
>
> A    That's correct.    It's [a] very
> conservative figure at that.
>
> Q    Well, it doesn't have anything to do with

the actual amount of the fraud, right? I mean, it's not based on any actual amount of fraud, the figure you're putting it at?

A    Again, that's argumentative. Again, if an insurance company paid out six times of medical bills, I don't think that Mr. Franco would have turned that down.

MR. JOBE:  Object, non-responsive.

THE COURT:  No.  You asked him an argumentative question.  He gave you an argumentative answer.  A pox on both of you.

Come on.  Let's go.  You got any more questions, please.

Jobe's examination of the Agent prior to this exchange had been extremely contentious, prompting the court to admonish both Jobe and the witness on several occasions.  The district court obviously recognized that those previous admonitions had been ineffective; that the examination had degenerated into unproductive argument between counsel and the witness.  The court understandably expressed its irritation with both the witness' and counsel's disregard of its previous attempts to move the questioning into a more productive area.

d.

The next example used by Franco is the court's response to counsel's request for Jencks Act material during his cross-examination of one of Franco's co-defendants:

THE COURT:  You know, that's not a proper thing to do in front of the jury.  You know that.  All you had to do was ask it at a recess, and we can get that.

Franco asserts that the Government had not objected to the Jencks request but, nevertheless, the district court, *sua sponte*, pointed

out the transgression and imputed bad faith to Franco's attorney.

Immediately prior to the challenged statement by the court, Jobe interrupted his cross-examination of a witness to request the Jencks material, implying both that it existed *and* that the Government had failed to produce it:

> MR. JOBE:  For the record, Your Honor, we have been provided with out of six meetings, only one statement.  I would like for the government to reassure me that there is no other out of all these other meetings, there's no written Jen[c]ks material that I can review.

In addition to being inappropriate in front of the jury, Jobe's request was more than just poorly timed; it violated the district court's prohibition of bench conferences during trial. The court's mild criticism of Jobe, and its subsequent reiteration that matters to be taken up outside the presence of the jury were to be handled during recesses, were quite appropriate responses to Jobe's extremely inappropriate comments and interruption of the trial.

e.

The final presented example of allegedly unwarranted criticism occurred when the prosecutor mistakenly referred to Franco as a lawyer; the court immediately pointed out that Franco is not a lawyer, and the prosecutor apologized for the mistake.

> MR. JOBE:  Your Honor, if I could.  We object ... to the interruption and correction there because of the fact, I mean, I don't disagree.

> THE COURT:  You know something, I run my courtroom.  You just do your job as a lawyer and I'll run my courtroom.  And [if] I think a

- 11 -

witness is making a mistake about one of the people in here, I'll correct it. If you don't like it, it's okay. The record is there and you've got every objection. Now sit down and let's go.

> MR. JOBE: Your Honor, I object –

> THE COURT: Fine. Now sit down. I've told you to sit down.

> MR. JOBE: Your Honor –

> THE COURT: Sit down and zip your lip.

> MR. JOBE: Your Honor, I object to the comments on the weight of the evidence, and if I don't make the objection now –

> THE COURT: Now, that is not right, and that is not the law. And I'm telling you right now, don't you interrupt me again. I'm doing something to make sure that these people understand exactly what's going on. Your client is not a lawyer, and I pointed that out to them. Now that, just there it is. It's on the record. You don't need to say anything. Proceed, please.

After the jury had been excused at the conclusion of that day's testimony, the court allowed Jobe to make a record of his objection. Jobe asserted that, when the court stated that Franco was not a lawyer, the court gave the witness information that the witness did not have previously. Franco also complains now about the court's comments during the exchange that followed:

> MR. JOBE: Your Honor, with all due respect, my impression was that [the] Court was extremely hostile and upset with me, and I mean –

> THE COURT: That didn't have anything to do with your questioning the witness. You know, you have this idea that I have to sit here as a deaf mute and not say anything. First of all, you're dead flat wrong. I have a right to comment on the evidence if I please

- 12 -

to do so. I rarely do, and I haven't done in this case other than on some occasions I've corrected some people and I corrected him on this one. If you want to cross-examine any of the witnesses about whether they know he's a lawyer or not, fine, go right ahead and cross-examine to your heart's content.

Now, if you've got anything else you want to make a record on, make it right now.

MR. JOBE: Your Honor, I just say obviously if the Court takes the position – tells the witness that this man is not a lawyer, I think it's pretty unlikely that the witness is going to disagree with the Court. That's my position on that. I don't think that the witness in the face of the judge in this case telling him this is not true, that he's going to persist in that as he might if I had questioned him without that.

THE COURT: You want to prove that your client is a lawyer?

MR. JOBE: I don't want to prove he's a lawyer. I want to prove the witness doesn't know what he was talking about, Your Honor.

THE COURT: This witness we just had on the stand?

MR. JOBE: Yes.

THE COURT: You've done a pretty good job of that already.

MR. JOBE: I appreciate it. I don't have quite the confidence that the Court does about that.

THE COURT: All right. You got anything else you want to do? He's back tomorrow. You can cross-examine him all you want about being a lawyer.

Franco is not a lawyer. Accordingly, the court's correction of the prosecutor's misstatement was an appropriate means to avoid confusing the jury. While the district judge doubtless regretted

- 13 -

the unfortunate "zip your lip" remark, his comments to Jobe were not unjustified, in the light of Jobe's objection, his repeated interruption of the court, and his refusal to comply with the court's instructions.

2.

Franco also maintains that two comments signaled to the jury the district judge's belief in Franco's guilt.

a.

The first comment was made during the cross-examination of co-defendant Patacsil, a physical therapist at DFW Therapeutic Clinic. On direct examination, Patacsil testified that she worked closely with Franco and discussed her preparation of fraudulent medical records with him five to ten times per week for one and one-half years. On cross-examination, Franco's counsel asked Patacsil what Franco had told her about himself. When the Government objected to the relevance of the question, defense counsel responded that the witness ought to know something about Franco if she had talked to him 1,000 times. Patacsil interjected: "Yeah, but we talked about business".

Her comment prompted the following exchange between the court and Jobe:

> THE COURT: You know they talked about business. The business, we know what the business is. How to defraud insurance companies. That's what she's talking about.
>
> MR. JOBE: Your Honor, we'll object to that comment as a comment on the weight of the evidence.
>
> THE COURT: No, I'm not talking about

- 14 -

> comment on the weight of the evidence. She's talking about defrauding the insurance company. Whether they did or not, these folks have to object [*sic*] to it.

The court "noted" the objection and instructed Jobe to "move along". Jobe then, once again, objected to the court not ruling on the objection.

Franco contends that the district court's characterization of the contents of Franco's discussions with Patacsil as "how to defraud insurance companies" improperly answered the ultimate question the jury was being asked to determine: whether Franco had defrauded insurance companies. We disagree.

Patacsil, who testified that she had pleaded guilty to conspiracy to commit mail fraud, had also testified extensively about her involvement in preparing fraudulent medical bills and records for Franco's "clients", which Franco forwarded to insurance carriers and through which he obtained negotiated settlements. She testified further that Franco handled her claim after she was involved in a staged accident, using the name "Arlene Camaclang"; that she had prepared fraudulent medical records signed by "Arlene Patacsil" in which she purported to provide medical treatment for "Arlene Camaclang"; and that Franco had submitted those records to the insurance company, knowing that Patacsil could not perform physical therapy on herself. Thus, the court summarized Patacsil's previous testimony accurately, but it properly left the question of the truth of her testimony up to the jury.

Moreover, Franco was not prejudiced by the court's comments. Immediately following the objection and challenged ruling, Franco's

counsel asked the witness whether all of her conversations with Franco were about how to defraud insurance companies; the witness responded that they were not, and that Franco usually was asking her if the medical billings were done.

b.

The other example cited by Franco as illustrating the court's belief in Franco's guilt occurred during the testimony of Manuel Dadufalza, who explained how he and Franco would pay each other cash kickbacks or "balik", depending on which of them had purchased the case from a runner.  Dadufalza testified that the kickbacks were usually paid in cash; and that, usually, the cash was exchanged in the law offices.  The prosecutor asked Dadufalza, "And why did you use cash to pay balik?"  Jobe interrupted, seeking clarification of the question:  "Your Honor, I didn't understand. Was it why do you or why does he?"  The court responded, "I think it was why did he".  Franco asserts that *the court* then explained:

> From what I understand, it's a matter of not getting the money on the books and it's also illegal.

Contrary to Franco's assertions (both in his brief and at oral argument), that statement was made *by the witness*, *not by the court*.  In any event, Jobe objected; and the following colloquy occurred:

> MR. JOBE:  Your Honor, I'm going to object to the statement, the witness testimony, as far as what's illegal–what's legal and what's illegal.  That's a state of the law, the Court's prerogative, and instruct the jury what the law is.
>
> THE COURT:  Well, it's obvious it's all

- 16 -

illegal.  You know when you're trading cash back and forth on phony claims which he says, that's illegal.  You don't contend that's legal do you?

MR. JOBE:  Your Honor, I don't know enough about the specific circumstances of what he's talking about to make a determination or not.

THE COURT:  Well, I will make a determination that when they have a phony claim and they start trading money back and forth between the doctors and the lawyers, that's illegal.

Franco contends that the court's characterization of the claims as "phony" and the payments as "illegal" was prejudicial. But, once again, Franco does not provide the full context. Significantly, he omits the next statement by the district judge: "That doesn't have anything to do with your client unless they prove your client is a part of it".

Considered in context, the judge's comments do not reflect a belief that Franco was guilty of the conspiracy charges.  The judge made clear to the jury that the Government would have to prove Franco's participation in the scheme.  In any event, because the payment of "balik" was part of the basis for the money laundering conspiracy charge for which the jury acquitted Franco, and not the mail fraud conspiracy charge for which he was convicted, Franco was not prejudiced by the court's comments.

During the charge conference, Jobe summarized his difficulties with the district judge — the resulting claimed prejudice to his client, Franco — as follows:

To the extent that I have ... caused the Court to lose its temper with me, I think there's

- 17 -

been at least five or six times the Court has yelled at me in the presence of the jury. To the extent that has been due to something I have done that justify [*sic*] that, I believe that it will materially influence the outcome of this trial. I find in my observation the jury has paid very close attention to the Court, and to the extent that my credibility is undercut by that, I think it's extremely damaging to the defendant's case....

Considering the record as a whole, we conclude otherwise. Restated, the district judge did not violate his duty to conduct the trial fairly and impartially.

The examples cited by Franco were isolated instances. Other portions of the record, not cited by Franco, reflect that the judge treated Jobe with respect. It is clear that the court's criticism stemmed from its irritation with tactics, by both the prosecutors and defense counsel, that slowed the pace of the trial or were likely to confuse the jury.

Moreover, in its preliminary instructions prior to commencement of testimony, the court instructed the jury that "nothing I may say or do during the course of the trial should be taken by you as indicating what your verdict should be. That is a matter entirely up to you". Likewise, in its jury charge, the court reminded the jury not to read "into anything the Court may have said or done, any suggestion from the Court as to what verdict you should return".

In sum, the record as a whole reflects that the trial was conducted in a fair and unbiased manner. We conclude that the jury's verdict was based on the evidence and was not improperly influenced in any way by the conduct of the trial judge. But, even

assuming *arguendo* that the challenged remarks were improper, Franco has not demonstrated that any error was substantial and that it prejudiced his case.

B.

As Franco concedes, our precedent forecloses his contentions that the district court erred by denying his requested instruction on reasonable doubt and by refusing to suppress the testimony of a Government witness claimed obtained in violation of 18 U.S.C. § 201(c)(2) (crime to confer a benefit on a witness in exchange for testimony). *See* **United States v. Williams**, 20 F.3d 125, 128-32 (5th Cir.) (approving reasonable doubt instruction substantially identical to that given in this case), *cert. denied*, 513 U.S. 891 (1994); **United States v. Haese**, 162 F.3d 359, 367 (5th Cir. 1998) (§ 201(c)(2) not violated when testimony obtained in exchange for favorable plea agreement), *cert. denied*, ___ S. Ct. ___, 1999 WL 241837 (1999).

III.

For the foregoing reasons, the judgment is

*AFFIRMED.*