**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

MICHAEL JAMES CASSIDY,
*Defendant-Appellant.*

No. 01-4400

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

GALEN CLIFTON SHAWVER,
*Defendant-Appellant.*

No. 01-4401

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

CLYDE B. BEVERLY,
*Defendant-Appellant.*

No. 01-4402

Appeals from the United States District Court
for the Middle District of North Carolina, at Durham.
William L. Osteen, District Judge.
(CR-00-262)

Argued: June 6, 2002

Decided: September 5, 2002

Before MICHAEL and GREGORY, Circuit Judges, and
Robert R. BEEZER, Senior Circuit Judge of the
United States Court of Appeals for the Ninth Circuit,
sitting by designation.

---

Affirmed by unpublished per curiam opinion.

---

## COUNSEL

**ARGUED:** David Bruce Freedman, WHITE & CRUMPLER, Winston-Salem, North Carolina, for Appellant Shawver; Nils Edward Gerber, Winston-Salem, North Carolina, for Appellant Cassidy; Michael W. Patrick, LAW OFFICE OF MICHAEL W. PATRICK, Chapel Hill, North Carolina, for Appellant Beverly. Douglas Cannon, Assistant United States Attorney, Greensboro, North Carolina, for Appellee. **ON BRIEF:** Anna Mills Wagoner, United States Attorney, Greensboro, North Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

PER CURIAM:

Michael James Cassidy ("Cassidy"), Galen Clifton Shawver ("Shawver") and Clyde B. Beverly ("Beverly") (collectively "Defendants") appeal their convictions and sentences for mail fraud, wire fraud, money laundering and conspiracy. Defendants contend that their convictions were based on insufficient and inadmissible evidence, that the prosecution shifted the burden of proof, and that the district court improperly instructed the jury. Cassidy and Shawver contend that the district court improperly enhanced their sentences.

Shawver contends that the district court violated his rights to counsel and of confrontation at trial.

We have jurisdiction pursuant to 28 U.S.C. § 1291. We conclude that the district court improperly, but harmlessly, admitted evidence of a non-testifying co-defendant's statements inculpating Shawver. Defendants' remaining arguments are without merit. We affirm.

I

Defendants marketed "international bank debentures" and other supposed high-yield international investments to small investors. The details of the purported investments varied and were never put in writing. Hopeful investors gave more than three million dollars to Defendants, but few, if any, ever saw their funds again.

One investor tape recorded Cassidy's pitch of the investment scheme. Cassidy told him that his funds would "never leav[e] the bank" and would be used to purchase securities issued by the United States Treasury. The securities would serve as "non-recourse" collateral in highly leveraged trades between European banks. The expected annual profit to the investor in these transactions was 300 per cent. Each of these statements by Cassidy proved false, and the investor never received a return of principal or profits.

Cassidy usually pitched the investments and portrayed Shawver or Beverly as the man handling the bank trades. Sometimes Beverly played the role of pitchman. Beverly also prepared paperwork for investors to sign. Prospective investors who decided to invest were instructed to wire their funds to an account Shawver controlled.

Once investors' funds were sent to Defendants, Defendants sent investors accounting statements purporting high profits in bank trades. The actual activity in Defendants' accounts showed no evidence of the supposed trades or profits. Meanwhile, Defendants used investors' funds to pay personal debts and expenses. Investors who attempted to withdraw their principal or profits received repeated excuses from Defendants instead of funds.

Several investors who sought to retrieve investment funds from Shawver before the period covered by the indictment complained to North Carolina authorities. In 1998, an attorney formerly employed by a company which Shawver controlled sent North Carolina and federal authorities an affidavit and copies of the company's bank records. The attorney accused Shawver of using funds in the company's pension accounts to pay his personal expenses. Based on this information, North Carolina authorities served a search warrant and froze a bank account containing investors' funds controlled by Shawver. Even after the account was frozen, Cassidy continued to pitch Defendants' scheme to new investors, directing them to wire funds to other accounts controlled by Defendants in other States.

Beverly contacted a North Carolina State investigator to discuss the frozen account. He offered to pay back all investors if the State would unfreeze Shawver's account and transfer the funds to an out-of-State account controlled by Beverly. The account remained frozen. Months later, Beverly sent a letter to investors informing them of the freeze and warning them that Shawver was under investigation for fraud. Federal authorities eventually seized the funds in the frozen account.

On August 1, 2000 a federal grand jury indicted Defendants on multiple counts of conspiracy, wire fraud, mail fraud and money laundering. On August 4, 2000 the district court appointed a public defender to represent each Defendant. The court set a trial date of September 11, 2000. Trial was later continued to October 30, 2000 on Shawver's motion.

On October 18, 2000, thirteen days before trial, Shawver moved pro se for discharge of his appointed counsel, Eric Placke ("Placke"), and for a 120 day continuance to seek private counsel. On October 21, 2000, the district court heard Shawver's motion. Shawver told the court that he and Placke had irreconcilable differences. He said Placke lacked banking expertise, had subpoenaed no witnesses, had ignored his many suggestions as to evidence and witnesses, and was biased against him. Shawver told the court he wished to proceed without Placke as counsel, and that a law firm had agreed to represent him on condition that he pay them a $300,000 retainer and secure a 120 day continuance. Shawver said his family was still raising funds for

the retainer, but that he did not want Placke to represent him in any event, even if it meant going to trial pro se.

The court questioned Shawver and Placke about their disagreements and Shawver's ability to represent himself. Placke described his efforts to prepare a defense and said he would be ready and able to defend Shawver at trial. Shawver said he had taken some college classes and had defended himself in previous civil actions. The court concluded that Placke and Shawver simply disagreed on defense tactics, and ruled that no good cause existed to discharge Placke.

The court told Shawver it would not grant him a continuance to seek private counsel, but that if Shawver secured private counsel before the final pretrial hearing on October 27, 2000 (six days later), it would "in all probability" grant a continuance to give the new counsel a chance to prepare for trial. The court warned Shawver very clearly that if he chose to discharge Placke and failed to hire private counsel in the next six days, he would have to go to trial pro se on October 30. Shawver said that he understood and wanted Placke discharged anyway. The court discharged Placke.

On October 27, 2000, Shawver appeared pro se at the final pretrial hearing and renewed his request for a 120 day continuance. He said he had not yet raised a retainer, seen the government's evidence or obtained exculpatory evidence. The court subjected Shawver's former counsel Placke to voir dire examination to explore Shawver's justifications for a continuance. Shawver and the government cross-examined Placke. The government told the court that Shawver's promises were "always just around the corner" and that the continuance should be denied. The court declined to grant a continuance, finding that Shawver had shown no excuse for moving so belatedly for discharge of counsel and postponement of trial.

Defendants' joint trial began on October 30 with Shawver representing himself. Shawver vigorously (if inexpertly) filed motions, made objections and cross-examined government witnesses. The court helped Shawver follow the rules of court and subpoena witnesses. Of the three Defendants, only Shawver testified or called witnesses in his defense.

The testimony of Shawver's last witness inculpated Beverly. The witness behaved so bizarrely on the stand, however, that both Cassidy and Beverly moved for the testimony to be stricken on grounds of witness incompetence. The district court conducted voir dire, determined that the erratic behavior of the witness was caused by hypoglycemia, and decided to allow the testimony.

After a 13 day trial, the jury convicted each Defendant of one count of conspiracy to commit fraud using mail or wire, one count of conspiracy to launder money, nine counts of mail fraud and three counts of wire fraud. The jury also convicted Shawver of nine counts, and Beverly of one count, of money laundering.

Shawver secured counsel for his sentencing from the law firm that had conditionally offered to represent him before trial. The district court found by a preponderance of the evidence that Cassidy and Shawver had mass-marketed, relocated and organized the scheme and that the scheme involved at least five people, and enhanced Cassidy's and Shawver's sentences. The court further enhanced Shawver's sentence based on its findings that he had obstructed justice and laundered over 2 million dollars. The court sentenced Defendants Cassidy, Shawver and Beverly to 99 months, 134 months and 46 months of imprisonment respectively.

Defendants appeal their convictions and sentences.

## II

Shawver contends that the district court violated his Sixth Amendment right to counsel by forcing him to forgo counsel and represent himself at trial without adequate time to prepare a defense. The district court properly resolved these Sixth Amendment claims.

In its three relevant pretrial rulings, the district court (1) denied Shawver's motion to dismiss appointed counsel Placke for cause, (2) granted Shawver's motion to dismiss Placke and proceed pro se and (3) denied Shawver's motion to continue. For clarity's sake we address these rulings seriatim, although we recognize that the three analyses are interrelated. We review the rulings generally for abuse

of discretion. *United States v. Mullen*, 32 F.3d 891, 895 (4th Cir. 1994). We review de novo whether Shawver voluntarily waived his right to counsel. *United States v. Singleton*, 107 F.3d 1091, 1097-98 & n.3 (4th Cir. 1997).

A.

The district court determined that Shawver lacked good cause to reject Placke as his appointed counsel. To determine whether the district court acted within its discretion, we examine whether the court conducted a thorough inquiry into the factual basis of Shawver's dissatisfaction. *Mullen*, 32 F.3d at 896. We further examine the timeliness of Shawver's motion, the adequacy of the district court's inquiry into Shawver's complaint and whether Placke's conflicts with Shawver were so great as to preclude an adequate defense at trial. *Id.*

Shawver first moved for discharge of Placke fewer than 14 days before trial. The district court addressed the motion and questioned Shawver and Placke closely about Placke's representation of Shawver. Placke told the court that he had worked nearly 130 hours on Shawver's case. He said he had considered Shawver's suggestions as to evidence and witnesses but rejected them as unwise both from "a trial advocacy standpoint" and in light of his "duty . . . as an officer of the court." Placke said he was "concern[ed]" about Shawver's level of dissatisfaction but would be ready and able to defend him at trial.

In response to Placke's explanations, Shawver simply repeated his assertion that Placke should have obtained the witnesses and evidence he suggested. He said again that the evidence and witnesses in question would exculpate him from the charges but did not intelligibly explain how. He did not rebut Placke's explanations for why he rejected the witnesses and evidence. In sum, Shawver failed to show that any of Placke's tactical decisions were incorrect. *See id.*

We conclude that the district court adequately inquired into Shawver's dissatisfaction with his appointed counsel and was within its discretion to conclude that no cause existed to dismiss Placke.

B.

After the district court refused to discharge Placke for cause, Shawver moved for the court to discharge Placke without cause and let Shawver handle his own representation.[1] The district court inquired into Shawver's level of education and whether he truly wished to forgo appointed counsel. The court accepted his waiver as knowing, intelligent and voluntary. Shawver argues that the court erred in accepting his waiver. We disagree.

Shawver enjoyed both a constitutional and statutory right to choose to represent himself at trial. 28 U.S.C. § 1654 (2001); *United States v. Lawrence*, 605 F.2d 1321, 1324 (4th Cir. 1979). "[A]lthough courts are commanded to protect the right to counsel zealously, the defendant can waive the right if the waiver is knowing, intelligent, and voluntary," *Singleton*, 107 F.3d at 1095, as well as clear and unequivocal. *Fields v. Murray*, 49 F.3d 1024, 1029 (4th Cir. 1995) (en banc). The trial court must determine from the record as a whole that the waiver is sufficient and need not necessarily conduct a "formalistic, deliberate, [or] searching inquiry." *United States v. Gallop*, 838 F.2d 105, 110 (4th Cir. 1988).

Shawver told the district court that he had some college education, worked as a mortgage banker and had represented himself in related civil proceedings. Shawver's letters to Placke while Placke was still his counsel show that Shawver was well aware of the nature and seriousness of the charges against him. The district court told Shawver that it saw no good cause to discharge Placke, that Placke was "one of the finest criminal defense lawyers in this Middle District," that self-representation without legal training would almost certainly be a grave mistake, that Shawver would not be able to change his mind once he rejected Placke as appointed counsel and that if he failed to appear with private counsel at the final pretrial hearing he would have to go to trial pro se and would not be granted a continuance.

Shawver said that he understood the district court's position, although he disagreed with it. Nevertheless, he insisted repeatedly and

---

[1]It does not appear that Shawver ever moved for appointment of substitute counsel to replace Placke.

unequivocally that he wanted Placke discharged. The district court obliged. Our examination of the trial record discloses no later expressions of uncertainty by Shawver that might have cast doubt on the genuineness or sufficiency of Shawver's waiver. *See United States v. Gillis*, 773 F.2d 549, 559 (4th Cir. 1985).

Shawver argues that his waiver was involuntary because the district court refused to continue the trial to allow him to seek private counsel or prepare his pro se defense. Shawver disagreed with the court's refusal to grant a continuance to seek counsel, but that does not render his waiver involuntary. *See Gallop*, 838 F.2d at 110. The court gave Shawver six days to hire the private counsel that he said he was arranging to hire. The court also told Shawver that if he indeed hired counsel he would be given an appropriate continuance to allow the new counsel to prepare his defense. Shawver knew that he had six days to secure new counsel and that the case would not be continued otherwise.

As for the district court's refusal to give Shawver additional time to prepare his pro se defense, the district court had already held that Shawver had no good cause to reject his counsel. At the time Placke was discharged, 13 days before trial, the court was well within its discretion to hold Shawver to the scheduled trial date.[2]

We conclude that Shawver's "refusal without good cause to proceed with able appointed counsel [wa]s a voluntary waiver" of appointed counsel. *Gallop*, 838 F.2d at 109 (quotation marks omitted). We conclude further that it was knowing and intelligent.

---

[2]The district court's later denials of Shawver's renewed requests for a continuance are irrelevant to the sufficiency of his waiver. Waiver is judged by the record "as known to the trial court at the time," *Singleton*, 107 F.3d at 1097, not by the court's refusal to grant subsequent motions to continue or the quality of Shawver's later defense of himself. "A defendant who exercises his right to appear *pro se* 'cannot thereafter complain that the quality of his own defense amounted to a denial of effective assistance of counsel.'" *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984) (quoting *Faretta v. California*, 422 U.S. 806, 834 n.46 (1975)).

In light of Shawver's waiver, the district court's dismissal of Placke appropriately reconciled the competing rights of representation by counsel and self-representation. *See Singleton*, 107 F.3d at 1096. Courts must respect the right to self-representation "even if [they] believ[e] that the defendant will benefit from the advice of counsel." *Id.* Refusal to accept a timely and genuine waiver can be reversible error. *Fields*, 49 F.3d at 1029. The district court was well within its discretion to take Shawver at his word and discharge Placke.

C.

Shawver argues that even if his waiver of appointed counsel was valid, the district court rendered his trial fundamentally unfair by not granting him a continuance after Placke was discharged to give Shawver more time to seek private counsel or prepare his own defense. "[C]ontinuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates [the Constitution] even if the [defendant] fails to offer evidence or is compelled to defend without counsel." *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964) (citations omitted). Whether a court has abused its discretion by denying a continuance "'must be found in the circumstances . . . particularly in the reasons presented to the trial judge at the time the request is denied.'" *Hutchins v. Garrison*, 724 F.2d 1425, 1432 (4th Cir. 1983) (quoting *Ungar*, 376 U.S. at 589). Shawver's argument has no merit.

Shawver showed up at the final pretrial hearing pro se and renewed his request for a continuance to seek counsel and prepare his defense. Shawver gave no new reasons for needing more time to seek counsel.[3] Shawver also complained that he had been improperly barred from obtaining, or ever seeing, the evidence against him.

The court placed Shawver's former counsel Placke on the witness stand to explore whether Shawver was justified in asking for a continuance to prepare his defense. Shawver cross-examined Placke. Placke indicated that he had not subpoenaed certain witnesses recommended by Shawver because he believed their testimony would be either

---

[3]Shawver sought a continuance a third time in a motion for reconsideration filed at the eve of trial. The motion was denied.

unhelpful or inadmissible. The government disputed Shawver's assertion that he had been denied access to evidence and suggested that Shawver was seeking merely to delay the trial. The court ruled that Shawver's request for a continuance to prepare his defense was untimely, and denied the motion.

Although the district court had to afford Shawver "a reasonable opportunity to secure counsel of his own choosing," *Gallop*, 838 F.2d at 107, and to prepare his defense, *Lee v. Winston*, 717 F.2d 888, 896 (4th Cir. 1983), "the court [wa]s entitled to take into account the countervailing state interest in proceeding on schedule." *Gallop*, 838 F.2d at 107. Shawver had months to prepare his defense while Placke was his counsel. It is true that Shawver himself had been enjoined from personal contact with any potential trial witnesses. Placke was not so enjoined, and Shawver has not shown that Placke failed to investigate and consider those witnesses sufficiently before trial. Shawver had both time and warning sufficient to safeguard his rights. The government had scheduled the appearance of numerous witnesses and the two other Defendants were ready to proceed with the joint trial. "The record here shows no unreasonable want of indulgence" of Shawver by the court. *Sykes v. Commonwealth*, 364 F.2d 314, 316 (4th Cir. 1966) (per curiam). In the circumstances, the district court was entitled to hold Shawver to the trial schedule.

*United States v. Gallop*, 838 F.2d 105 (4th Cir. 1998), supports our conclusion that the district court acted within its discretion. In *Gallop*, the district court rejected defendant's claims of irreconcilable differences with appointed counsel, granted defendant's motion to discharge counsel and proceed pro se, and denied his motion for a continuance to prepare his defense. *Id.* at 107. We held that the district court acted within its discretion. *Id.* at 108-09. Although defendant's former counsel remained in the proceedings in *Gallop* as "backup" counsel, *id.* at 107, the analysis did not turn on the presence of backup counsel. *See id.* at 107-09; *see also Singleton*, 107 F.3d at 1100 (holding that pro se defendants have no general right to backup counsel).

Shawver argues that he was entitled to a continuance under *Mullen*, 32 F.3d 891, in which we vacated a conviction on the ground that the district court should have granted the defendant's motion, made a

month before trial, to substitute counsel. The facts of *Mullen* differ substantially from the facts of this case. In *Mullen*, the trial court found that irreconcilable differences existed between defendant and her counsel. *Id.* at 896-97. In this case, the district court found no such breakdown in Shawver's relationship with Placke. In *Mullen*, the trial court did not explicitly find defendant's motion to be untimely and the government in fact conceded that it was timely. *Id.* In this case, the district court explicitly found Shawver's motion to be untimely and the government makes no contrary concession. *Mullen* does not support the contention that the district court in this case abused its discretion.

We conclude that the district court acted within its discretion in denying Shawver's requests for a continuance.

### D.

In sum, we conclude that Shawver validly waived his right to appointed trial counsel and that the district court's pretrial rulings, whether taken individually or collectively, fell within its discretion. Shawver's Sixth Amendment right to counsel was fully protected by the district court.

### III

Shawver argues that the district court violated his Confrontation Clause rights under *Bruton v. United States*, 391 U.S. 123 (1968), by admitting evidence of statements by his co-defendant Beverly inculpating him. We agree that *Bruton* error occurred, but conclude that the error was harmless.

A paradigmatic *Bruton* violation occurs when, at a joint trial, a court admits into evidence a non-testifying defendant's custodial confession inculpating a co-defendant. *Close v. United States*, 450 F.2d 152, 153 (4th Cir. 1971). Shawver suggests that we review for abuse of discretion with de novo review of associated questions of law. We need not decide whether Shawver is correct,[4] for it is clear that harm-

---

[4]The record does not show clearly whether Shawver preserved or defaulted the *Bruton* issue. Shawver never objected at trial to the intro-

less error analysis applies, *Harrington v. California*, 395 U.S. 250, 254 (1969), and under Shawver's suggested standard of review no prejudicial *Bruton* errors occurred.

Shawver points first to a North Carolina law enforcement agent's testimony concerning telephone conversations the agent had with Beverly in late 1997 and early 1998. According to the agent, Beverly made several statements damaging to Shawver during these conversations. Beverly did not testify at trial and could not be cross-examined by Shawver. We nevertheless find no reversible error in the admission of these statements.

Beverly's statements to the agent were not custodial, were not confessions and did not appear to intentionally inculpate Shawver or anyone else. Contrary to Shawver's assertions, Beverly did not explicitly admit to the agent any wrongdoing by himself or Shawver. Beverly never told the agent that the investment scheme was a scam or that Beverly had fallen out with Shawver. It appears that, in an attempt to convince the agent to unfreeze Shawver's accounts, Beverly assured the agent that Defendants, including Shawver, were blameless. We conclude that Beverly's statements were at least arguably made in furtherance of the conspiracy between Defendants. Statements that both inculpate a co-defendant in a conspiracy with the speaker and further that conspiracy do not run afoul of *Bruton*. *United States v. Inadi*, 475 U.S. 387, 400 (1986).

Shawver also points to the admission of evidence that Beverly sent a letter to investors months after his conversation with the agent warning them of "fraud by Mr. Shawver, the trustee." Although this statement does not explicitly accuse Shawver of wrongdoing, it tends to inculpate Shawver and does not further any conspiracy between him and Beverly. Although Beverly was not in custody at the time, he knew that both he and Shawver were under investigation and that

---

duction of Beverly's inculpatory statements. He did, however, move for their exclusion *in limine* through his counsel Placke. The district court sought to dispose of all pending motions *in limine* after discharging Placke, and seemed to overlook this one, but nevertheless entered a minute order the same day stating that the motion was "mooted." We assume that the *Bruton* issue is preserved.

he stood to gain by inculpating Shawver. *See Lee v. Illinois*, 476 U.S. 530, 541 (1986). We conclude that admission of this statement violated Shawver's confrontation rights under *Bruton* and was an abuse of discretion. *Id.*

We further conclude, however, that this error did not prejudice Shawver. The government did not need to rely on statements by Shawver's co-defendants to inculpate Shawver. Admitted evidence from other sources that Shawver helped defraud investors was overwhelming. Defendants never seriously contested the evidence that they took investors' funds under false pretenses and failed to use the funds to purchase the instruments described to investors. Shawver conceded that he controlled accounts containing investors' funds and wrote checks from them to pay credit card bills, tort judgments and other personal expenses. He conceded that he continued to accept deposits of funds from new investors without disclosing the freezing of earlier investors' deposits by State and federal authorities investigating complaints by earlier investors. Shawver's explanations for these actions were rambling and without evidentiary support. Beverly's warning that Shawver was being investigated for possible wrongdoing was merely cumulative in light of the "wealth of condemnatory evidence" against Shawver. *United States v. Crockett*, 813 F.2d 1310, 1315-16 (4th Cir. 1987). Its admission was harmless beyond a reasonable doubt. *Id.*

We conclude that admission of Beverly's conversations with the North Carolina law enforcement agent did not violate Shawver's rights under *Bruton*. Beverly's statement to investors that Shawver was under investigation, although erroneously admitted, was harmless.

IV

Shawver asserts that much of the evidence at trial was fruit of a poisonous tree, the seed of which was the affidavit given to law enforcement officials in 1996 by an attorney formerly employed by Shawver's company. The information in this affidavit formed part of the basis for search warrants executed against Shawver's home, office and bank records in 1998. Shawver argues that the information in the affidavit was protected by the attorney-client privilege and that the

evidence obtained as a result of these searches is inadmissible. We reject Shawver's argument.

Shawver raised this issue in a motion *in limine* to suppress the evidence in question. The district court reserved its ruling on this motion, and Shawver did not apparently raise the issue again until now. We accept Shawver's suggestion to review for clear error, with de novo review of legal questions. *See Hawkins v. Stables*, 148 F.3d 379, 382 (4th Cir. 1998).

We must narrowly construe the attorney-client privilege, and Shawver has the burden to show that the privilege is applicable. *Id.* at 383. In its opposition to Shawver's motion *in limine*, the government pointed out correctly that the affidavit includes a mix of the affiant's personal observations, statements by various persons and contents of various documents. Shawver's motion did not describe which facts in the affidavit, if any, were covered by the privilege and which were not. On appeal, Shawver fails to supply any more specificity and simply repeats his blanket assertion that the entire affidavit is privileged. Shawver has failed to carry his burden of proof to demonstrate the existence, let alone the applicability, of the claimed privilege. *See id.* at 383-84.

Moreover, Shawver does not dispute the government's assertions that the client of the affiant attorney was Shawver's company rather than Shawver himself, and that Shawver introduced this affidavit into the public record in earlier court proceedings. Either of these assertions, if true, waives whatever privilege might have formerly attached to the affidavit. *See id.* at 383; *United States v. Oloyede*, 982 F.2d 133, 141 (4th Cir. 1993) (per curiam).

We conclude that Shawver has not demonstrated that the attorney-client privilege applies to the affidavit in question. Admission of evidence seized on the basis of the affidavit was not erroneous.

V

Defendants argue that the government sought to convince the jury that the type of investments Defendants offered were fraudulent per

se, and contend that under *Holland v. United States*, 348 U.S. 121 (1954), this "indict the industry" theory shifted the burden of proof to Defendants. Defendants claim (without citing the record) that they preserved this issue by objecting to the statements in question. We have searched the record and find no sufficient objection. We review for plain error. *United States v. Williams*, 990 F.2d 507, 510 (9th Cir. 1993). No error occurred.

One expert witness for the government testified that the rates of return promised to investors by Defendants are characteristic of Ponzi schemes and practically impossible in legitimate investments. Defendants argue that these statements shifted the burden of proof from the government to Defendants and constitute reversible error. In the alternative, Defendants argue that the court should at least have given the jury tailored instructions concerning "the nature of the [government's supposed "indict the industry" theory], the assumptions on which it rests, and the inferences available both for and against the accused" in addition to the standard instructions concerning burden of proof. *Id.*; *see United States v. Carter*, 721 F.2d 1514, 1539 (4th Cir. 1984).

We cannot accept Defendants' contention that the government employed a theory of indirect proof comparable to the "net worth" method of proof employed in *Holland*.[5] The government's theory at trial was not that the investments Defendants offered were intrinsically fraudulent, but that the investors' funds were never invested. The government concentrated on showing that Defendants' sales pitch was filled with falsehoods and that Defendants used investors' funds for their own personal expenses instead of investing them as promised. The characteristics of the "investments" themselves were of comparatively minor, if any, importance.

---

[5]In *Holland*, the government sought to prove tax evasion indirectly using a net worth theory, by showing that defendants had obtained more assets during the year in question than could be explained by their reported net income. 348 U.S. at 125; *see United States v. Bethea*, 537 F.2d 1187, 1188-89 (4th Cir. 1976). The Supreme Court warned that a theory of guilt based on such indirect and approximate circumstantial evidence required careful scrutiny and "especially clear" jury instructions to avoid shifting the burden of proof to defendants to prove their innocence. *Holland*, 348 U.S. at 129.

Throughout the trial, the district court's relevancy rulings hewed consistently to this theory. The government's closing argument, contrary to Defendants' assertions, did not refer to or rely upon expert testimony supporting an inference that the returns Defendants promised were impossible except in Ponzi schemes. The jury was instructed clearly, correctly and sufficiently on the burden of proof.

The government's attempts to characterize Defendants' investment scheme as shady were not nearly as "fraught with danger to the innocent" as the indirect method of proof used in *Holland*. 348 U.S. at 125. We discern no "more than the ordinary use of circumstantial evidence in the usual criminal case." *United States v. Bethea*, 537 F.2d 1187, 1188 (4th Cir. 1976). The government did not shift the burden of proof to Defendants.

## VI

Defendants argue that the district court should have granted their motions for acquittal, made at the close of the government's case in chief, on the ground that insufficient evidence supported their convictions. We examine the evidence adduced at trial in the light most favorable to the government. *Crockett*, 813 F.2d at 1316. If any rational jury could have convicted Defendants, this argument must fail. *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982). It fails.

The government presented ample evidence that Defendants frequently transferred investors' funds between accounts they controlled and communicated with each other concerning these transactions. There was ample evidence that Defendants lied to investors about expenditures of invested funds and that few investors ever recovered any funds. When accounts were frozen, Defendants carried on with other accounts in other States and did not alert investors of ongoing investigations by the authorities.

The cruces of Cassidy's defense were that he believed the investment scheme he was pitching was legitimate and he never profited from Shawver's and Beverly's fraudulent activities. Cassidy communicated constantly with Shawver and Beverly. He supplied investors with innumerable excuses why they were not receiving their funds.

He convinced investors to send funds to accounts controlled by the conspirators and then transferred the funds to another defendant's personal account. Moreover, there was affirmative evidence from which the jury could conclude that Cassidy and his brother were both paid investors' funds out of accounts Shawver controlled. A rational jury could conclude from this evidence that Cassidy could not possibly have believed that investors were not being cheated by this investment scheme. The jurors could also conclude that Cassidy profited from the scheme himself.

The crux of Shawver's defense was that the withdrawals of investors' funds from his accounts were accomplished either to pay valid trust expenses or in legitimate "ledger transfers" backed by an emerald he claimed to own. Shawver never produced this fabled gem or even purported to account for more than a fraction of the alleged "expenses." He never explained how credit card bills, utility bills, golfing fees or personal mortgage payments could constitute valid use of investors' funds by persons who were supposedly entrusted with such funds for use as collateral in safe international banking trades. Shawver personally performed the transactions that were the basis of most of the money laundering counts.

The crux of Beverly's defense was that he believed everything Shawver told him. There was ample evidence to the contrary. Beverly prepared what paperwork was associated with the scheme and pitched the scheme to several investors. He received investors' funds from an account Shawver controlled. He tried to convince State investigators to transfer the funds in Shawver's frozen accounts into one of his own accounts in another State. His warning letter to investors came months after he became aware of the investigations and after he had received investors' funds from Shawver.

That much of the evidence against Defendants is circumstantial does not make it insufficient. *Crockett*, 813 F.2d at 1316. We conclude that the evidence supports Defendants' convictions on every count reflected in the verdict.

## VII

Defendants unsuccessfully objected to a standard jury instruction given by the district court known as the "wilful blindness" or "ostrich"

instruction. The instruction essentially told the jury that they could infer scienter from "proof that a defendant deliberately closed his eyes to what would have been obvious to him." Defendants contend that the evidence did not support the instruction. Review is for abuse of discretion. *United States v. Ruhe*, 191 F.3d 376, 384 (4th Cir. 1999). There was no abuse.

The wilful blindness instruction is proper if there was evidence from which the jury could infer that Defendants took conscious actions to escape confirmation of what they strongly suspected. *United States v. Whittington*, 26 F.3d 456, 462-63 (4th Cir. 1994). There was evidence that Cassidy and Beverly parroted to investors statements made by Shawver that they had strong reason to doubt and refused to discuss the possibility that Shawver was lying. There was evidence that Shawver did not know where all the investors' funds flowing into his accounts was coming from, yet continued to accept the deposits into his account and withdraw the funds for personal expenses. The jury could have concluded that all three Defendants were deliberately avoiding knowledge of the details of each other's illicit activities. *Id.*

The district court did not abuse its discretion by instructing the jury that wilful blindness can show scienter.

## VIII

Cassidy and Shawver contend that the district court improperly admitted certain evidence of their similar bad acts under Federal Rule of Evidence 404(b). Rule 404(b) prohibits admission of such evidence solely to establish bad character, but permits it for other purposes "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b). We review for abuse of discretion. *United States v. Haney*, 914 F.2d 602, 607 (4th Cir. 1990). We conclude that no abuse occurred.

### A.

Cassidy objected unsuccessfully to testimony by an investor about fraud by Cassidy not covered by the charges in this case. The investor

testified that Cassidy persuaded her to invest in a purported invest-ment similar to those involved in this case and that she never saw her funds again. The district court warned jurors to consider this testi-mony only for Rule 404(b) purposes and only against Cassidy. This evidence was relevant to show both that Cassidy used a standard modus operandi to sell bogus investments and that he did not mis-takenly believe that the investment scheme in this case was legiti-mate.

Cassidy also argues that numerous references at trial to corporate "investment" seminars in the Caribbean in which Cassidy gave pre-sentations to small investors amounted to impermissible evidence of his bad character. No Defendant objected when the government men-tioned the seminars in its opening statement. Cassidy elicited the first evidence of these seminars with leading questions during cross-examination of government witnesses. Cassidy opened the door to further testimony regarding the seminars. The admission of this testi-mony was not erroneous.

B.

Shawver contends that testimony by former investors concerning their dealings with Shawver before 1998 and 1999 should not have been admitted against him. These transactions occurred prior to the illicit activities alleged in the indictment. Shawver says this testimony was evidence of his bad character in general. Shawver did not object to this evidence at trial. No plain error occurred.

The investors in question testified that they had to sue Shawver before he returned their principal. Shawver told them at first that the invested funds were not available. Shawver eventually returned prin-cipal in 1998 and 1999, within the period covered by the indictment. This testimony was relevant to show that Shawver's claims of vast hidden assets in that period, which supposedly served as collateral for his withdrawals of investors' funds from his accounts, were false. The evidence was admissible under Rule 404(b) to show knowledge and intent.

We conclude that the district court did not abuse its discretion in admitting this evidence against Cassidy and Shawver.

IX

Cassidy and Beverly argue that the district court improperly denied their motion to strike the testimony of an elderly attorney called as a witness by Shawver. The motion urged the court to hold that the witness was incompetent to testify. All witnesses are presumed competent to testify even if they are "feeble-mind[ed] or insan[e]." *United States v. Odom*, 736 F.2d 104, 112 (4th Cir. 1984); *see also* Fed. R. Evid. 601. The only permissible grounds for disqualifying a witness as incompetent are "that the witness 'does not have knowledge of the matters about which he is to testify, that he does not have the capacity to recall, or that he does not understand the duty to testify truthfully.'" *Odom*, 736 F.2d at 112 (quoting *United States v. Lightly*, 677 F.2d 1027, 1028 (4th Cir. 1982)). "Whether the witness has such competency is a matter for determination by the trial judge after such examination as he deems appropriate and his exercise of discretion in this regard is to be reversed only for clear error." *Id.* at 112-13. The district court did not err.

The witness in question gave testimony inculpating Beverly. At various times during his testimony, the witness spoke very slowly and nodded and chuckled inappropriately to the jury. The court excused the jury and instructed the witness to stop acting in this manner. During voir dire examination the behavior of the witness became even more bizarre. He had trouble recalling certain events, contradicted himself repeatedly, and seemed to be disoriented. At one point he could not tell the court for several minutes what day of the week it was.

The court examined the witness to determine whether to grant the motion to strike. The witness told the court that he suffered from hypoglycemia and needed to eat some food to alleviate the condition. The witness was allowed to consume some cookies given him by the court. He said that this nourishment helped his condition. The court decided to deny the motion to strike and to let the jury decide "for itself whether [the testimony was] incredible or not." The court noted that the erratic behavior of the witness would weigh heavily against his credibility in the eyes of the jury. The witness continued to testify and also to make inappropriate gestures and responses. The court

stopped the testimony repeatedly to admonish the witness to respond in an appropriate manner.

The district court did not clearly abuse its discretion in admitting the testimony. It is true that the witness often had trouble recalling events or following the court's instructions. Despite this disorientation, most of his testimony appeared lucid. The court was "much closer than [the] court of appeals to the pulse of the trial." *United States v. Russell*, 971 F.2d 1098, 1104 (4th Cir. 1992). When there is doubt, we will respect the district court's finding that sufficient credibility existed to permit the jury to "hea[r] the testimony for what it is worth." *Odom*, 736 F.2d at 112.

We conclude that the district court did not err when it denied the motion to strike the testimony.

X

Cassidy and Shawver challenge several aspects of their sentences. The district court's determinations pursuant to the Sentencing Guidelines are reviewed for clear error to the extent they turn primarily on a factual determination, and "closer to de novo" to the extent they turn primarily on the legal interpretation of a Guideline term. *United States v. Jones*, 31 F.3d 1304, 1315 (4th Cir. 1994) (emphasis omitted).

A.

Cassidy and Shawver argue that the district court's enhancement of their sentences for mass marketing and relocation of their scheme pursuant to subsections 2F1.1(b)(3) and (6) of the Sentencing Guidelines violates the Ex Post Facto Clause. The enhancements in question were added to the Sentencing Guidelines in amendments that became effective November 1, 1998. *U.S. Sentencing Guidelines Manual* app. C supp., amend. 577 (2001). The Constitution forbids their application to Cassidy and Shawver unless their offenses occurred or continued past that date. *United States v. Heater*, 63 F.3d 311, 331 (4th Cir. 1995).

There was sufficient and clear evidence that Cassidy solicited and Shawver deposited investors' checks in calendar year 1999. Whether Cassidy and Shawver continued to commit specific overt acts of "mass marketing" and "relocation" in furtherance of the scheme after 1999 has no bearing upon the proper guideline version applicable in this case. *United States v. Meitinger*, 901 F.2d 27, 28-29 (4th Cir. 1990). The district court did not clearly err in concluding that Shawver and Cassidy continued to be members of the charged conspiracies after November 1, 1998.

We conclude that Cassidy's and Shawver's offenses continued after the date the guidelines amendment applied by the trial court became effective. Cassidy's and Shawver's mass marketing and relocation enhancements did not violate the Ex Post Facto clause.

### B.

Cassidy and Shawver argue that the district court erred when it enhanced their sentences for being organizers of a scheme with at least five participants pursuant to subsection 3B1.1(a) of the Guidelines. We disagree.

Four conspirators were indicted: Cassidy, Shawver, Beverly and a fourth who pleaded guilty. The district court found by a preponderance of the evidence that Shawver's hypoglycemic witness was a fifth participant.[6] *Cf.* Part IX *supra* (affirming denial of motion to strike this witness's testimony on competency grounds). The witness testified that he told investors that their funds were safely invested in government securities, and that Shawver paid him from investors' funds. The government expressed interest in indicting the witness based on his trial testimony. The court did not clearly err in finding this witness

---

[6]The district court could properly find that this witness was a co-conspirator by a preponderance of the evidence without submitting the question to the jury. Even after their enhancements, Cassidy's and Shawver's sentences fell well below the statutory maximum sentences for which the jury's verdict made them eligible. *United States v. Angle*, 254 F.3d 514, 518 (4th Cir. 2001) (en banc) (construing *Apprendi v. New Jersey*, 530 U.S. 466 (2000)).

to be a fifth co-conspirator. The organizer enhancement was applicable.

Cassidy argues that he was not an organizer of the scheme because he did not share in its profits and joined only after it was formed by Shawver and Beverly. There was evidence that Cassidy profited from the conspiracy, and the record as a whole supports the conclusion that Cassidy was the scheme's primary pitchman from the beginning. The court did not clearly err in finding that Cassidy was an organizer.

Shawver argues that he was not an organizer because he did not direct the others' actions in the scheme and took no more than an equal share of the profits. Shawver controlled the key accounts and was the only conspirator licensed as a mortgage banker. Cassidy and Beverly told investors that Shawver controlled the investments. The record overwhelmingly supports the district court's finding that Shawver was an organizer.

We conclude that the district court did not clearly err when it enhanced Cassidy's and Shawver's sentences for being organizers of a scheme with at least five members.

## C.

Shawver argues that the district court erroneously enhanced his sentence pursuant to subsection 3C1.1(a) of the Guidelines for trying to influence grand jury witnesses and giving false testimony at trial. At least one former investor testified, under cross-examination by Shawver, that Shawver approached him just before the investor testified before the grand jury and "tr[ied] to persuade [him] to be somewhat uncooperative with the grand jury." The district court did not clearly err when it enhanced Shawver's sentence for obstruction of justice.

## D.

Shawver argues that the district court erred in adjusting upward his offense level on the money laundering counts pursuant to subsections 2S1.1(b)(2)(G) and 2S1.2(b)(2) of the 2000 Guidelines, based on a

determination that Shawver laundered between 2 million and 3.5 million dollars. Shawver argues that a $500,000 wire transfer of investors' funds and certain other transfers flowing from the First Tennessee Bank should not have been included in this total. After a careful review of the record, we conclude that the evidence supports the district court's determination of the sum involved.

Shawver argues that the evidence does not show that the $500,000 wire transfer was an act properly considered as money laundering. It does not appear that Shawver raised this objection at sentencing. According to the evidence, the transfer was supposedly intended to purchase "bank guarantees" worth hundreds of millions of dollars which proved to be fraudulent. The record does not show that the funds transferred were ever recovered. We see no plain error in the district court's finding that Shawver laundered these funds.

Shawver argues that he could not be held responsible for laundering the remaining First Tennessee Bank funds transfers because there was no direct evidence that he knew they had been made. The fund transfers came from a co-conspirator's account. When Shawver made this argument at sentencing, the district court rejected it on the ground that co-conspirators' knowledge could be imputed to Shawver. The district court's statement of the law is correct. *United States v. Cummings*, 937 F.2d 941, 943-45 (4th Cir. 1991).

The district court properly adjusted Shawver's money laundering offense level.

## XI

We affirm Defendants' convictions and sentences.

*AFFIRMED*